ELIZABETH O'NEILL *v.* EDWARD O'NEILL
(4932)

DUPONT, C. J., STOUGHTON and FOTI, Js.

Argued November 5, 1987—decision released January 26, 1988

*Abraham I. Gordon,* with whom were *Ronald D. Japha* and, on the brief, *Richard S. Scalo,* for the appellant (plaintiff).

*Reuben S. Midler,* for the appellee (defendant).

DUPONT, C. J. The plaintiff wife appeals from the judgment rendered in this fully contested dissolution action, challenging the custody and financial awards ordered by a state trial referee acting as the trial court. The court dissolved the parties' marriage and awarded sole custody of their minor child to the defendant husband, with limited visitation rights in the plaintiff. The court awarded the plaintiff rehabilitative alimony in the amount of $200 per week for a duration of two years. The court did not award the plaintiff any lump sum property settlement nor did it order the defendant to pay the plaintiff's counsel fees.

The plaintiff has raised four claims of error on appeal. She argues that the trial court erred (1) in awarding custody of the minor child to the defendant, (2) in refusing to award counsel fees to the plaintiff, (3) in refus-

ing to award to the plaintiff a lump sum distribution as a property settlement, and (4) in awarding rehabilitative alimony for only a two year duration. We find error.

I

We first address the issue of custody. In its memorandum of decision, the trial court found that the parties were hostile toward one another and that the child would benefit the most by living in the home that offers the most stability. The trial court reviewed the background of the parties and noted that the "plaintiff has been confined to a psychiatric hospital in her youth, has suffered from severe chronic depression, had a problematic and sad life from childhood, is functionally disabled at times and needs to receive drug treatments which she has refused." The attorney for the child recommended that custody be awarded to the plaintiff. A family relations case study report which was written thirteen months prior to the court's determination of custody was introduced at trial. The trial court stated that the "Domestic Relations Officer has written an extensive report in this case based on a very good investigation and has recommended custody of Jennifer to be in the defendant as the parent who tends to be more secure." On the basis of the thirteen month old family relations case study report and all other evidence, the court awarded sole custody of the minor child to the defendant with the plaintiff to have specified visitation rights.

Our standard of review in domestic relations cases is a very narrow one. We will not reverse a trial court's rulings with regard to custody and financial orders unless the court incorrectly applied the law or could not reasonably have concluded as it did. *Timm* v. *Timm*, 195 Conn. 202, 210, 487 A.2d 191 (1985).

In making a determination of custody, the governing standard is the best interests of the child. General Statutes § 46b-56; *Yontef* v. *Yontef,* 185 Conn. 275, 282, 440 A.2d 899 (1981). "[T]he court [is] bound to consider the child's *present* best interests and not what would have been in her best interests at some previous time." (Emphasis in original.) *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 664, 420 A.2d 875 (1979); see also *Guss* v. *Guss,* 1 Conn. App. 356, 361, 472 A.2d 790 (1984).

The court below erred in failing to consider the present best interests of the child when it determined the issue of custody. The court's recitation of the plaintiff's past medical history in its memorandum of decision does not focus on the present abilities or infirmities of the plaintiff as they may affect her ability to be a primary caretaker of the child. The references therein to the plaintiff's confinement to a psychiatric hospital, chronic depression, a problematic and sad childhood, children born out of wedlock, and life on welfare are all past events. Furthermore, the family relations custody report was thirteen months old at the time of its introduction into evidence. To compound its error in relying on outdated evidence which is not probative of present parenting abilities, the trial court admitted that it placed great weight on the written report: "The report had a great influence in this case, there's no question about it."

At trial, the domestic relations officer testified that after his completion of the custody report in October of 1984, he had no contact with the parties or the minor child except for one meeting thereafter. Most significant, however, is his testimony that due to the passage of time he could not competently testify as to whether the parties' stability and security had changed since his report.

We recognize that a party's prior conduct and past medical condition may have a direct bearing on his or her present fitness to be a custodial parent. "In the exercise of its awesome responsibility to find the most salutory custodial arrangement for the children of divorce, the court must . . . take account of the parents' past behavior, since it must evaluate their present and future parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the children's growth, development and well-being." *Yontef* v. *Yontef,* supra, 283. At the same time, however, the focus of the court's inquiry must be designed to meet the primary objective which is to determine the present parenting ability of the parties. Based upon the facts and conclusions as set forth in the trial court's memorandum of decision, it is evident to this court that the trial court did not consider those paramount interests.

Ordinarily, a finding of error in the trial court's order of custody would require custody to revert to the status quo ante until a new hearing is held. We are aware, however, that the minor child has been living with the defendant for more than two years and that the best interests of the child might not be served by requiring the child to return to the plaintiff's residence pending a new hearing. Our supervisory power, pursuant to Practice Book §§ 2000 and 4183, "includes the power to make appropriate postappeal orders. See *In re Juvenile Appeal (83–BC),* 189 Conn. 66, 81, 454 A.2d 1262 (1983)." *Guss* v. *Guss,* supra, 365 (*Borden, J.,* concurring). In order to "[protect] the primary interests of the [child] in a continuous, stable custodial placement"; *Yontef* v. *Yontef,* supra, 291–92; we order that physical custody of the child remain with the defendant until the trial court has had an opportunity to address the issue of custody at a new hearing.

## II

The second claim of error raised by the plaintiff is that the trial court erred in not awarding her any counsel fees. The trial court originally made no specific ruling on the issue of counsel fees. On a motion for articulation, the court denied the plaintiff's request for counsel fees on the ground that she had commenced the case: "If she were the defendant in this case I always order a fee because she's required to defend herself when the husband brings suit against her." The plaintiff argues that the court has misconstrued the basis for an award of counsel fees. We agree.

Pursuant to General Statutes § 46b-62, a trial court has the discretion to award counsel fees to a party in a dissolution action "in accordance with their respective financial abilities and the criteria set forth in Section 46b-82," including length of the marriage, causes for the dissolution of the marriage, the age, health, station, occupation, amount and sources of income, vocational skill, employability, estate and needs of each party. *Holley* v. *Holley,* 194 Conn. 25, 34, 478 A.2d 1000 (1984); *Szilagyi* v. *Szilagyi,* 3 Conn. App. 25, 28, 484 A.2d 469 (1984).

The unambiguous language of § 46b-62 makes it clear that the statutory authorization for awarding counsel fees is not dependent on the status of a spouse as plaintiff or defendant. It was, therefore, improper for the trial court to determine the issue of counsel fees in a dissolution action on the basis of party status. Rather, the proper inquiry should have focused on the statutory criteria.

The undisputed facts show that the plaintiff did not have the funds available with which to pay for her counsel fees, whereas, the defendant did. " 'Courts ordinarily award counsel fees in divorce cases so that a party

(usually the wife) may not be deprived of her rights because of lack of funds. *Krasnow* v. *Krasnow,* 140 Conn. 254, 265, 99 A.2d 104 (1953); *Steinmann* v. *Steinmann,* 121 Conn. 498, 504, 186 A. 501 (1936).' *Ridolfi* v. *Ridolfi,* 178 Conn. 377, 380, 423 A.2d 85 (1979)." *Koizim* v. *Koizim,* 181 Conn. 492, 501, 435 A.2d 1030 (1980). These rights exist regardless of whether a party is a plaintiff or a defendant.

Although the trial court is not obligated to make express findings on each of the criteria enumerated in § 46b-82; *Weiman* v. *Weiman,* 188 Conn. 232, 234, 449 A.2d 151 (1982); the memorandum of decision must at least reflect that the trial court properly considered and weighed the factors set forth in the statute in determining the granting of attorney's fees. *Holley* v. *Holley,* supra, 31-32; *Szilagyi* v. *Szilagyi,* supra, 29. It is apparent from the trial court's remark that it would have ordered counsel fees if the plaintiff were the defendant. That articulation makes it clear that the court did not properly apply the law.

### III

The plaintiff next argues that the trial court erred in refusing to award a lump sum property settlement. General Statutes § 46b-81 provides that the court in a dissolution action may assign to either spouse all or any part of the estate of the other, including title to real estate. This statutory provision is permissive not mandatory. *Debowsky* v. *Debowsky,* 12 Conn. App. 525, 526, 532 A.2d 591 (1987). "A fundamental principle in dissolution actions is that a trial court may exercise broad discretion in awarding alimony and dividing property as long as it considers all relevant statutory criteria. *Carpenter* v. *Carpenter,* 188 Conn. 736, 740-41, 453 A.2d 1151 (1982); *Carter* v. *Carter,* 8 Conn. App. 356, 358, 512 A.2d 979 (1986)." *Debowsky* v. *Debowsky,* supra. Although the provisions for assign-

ments of property and awards of alimony are contained in separate statutes, the standards by which the courts determine such awards are almost the same. *Pasquariello* v. *Pasquariello,* 168 Conn. 579, 583, 362 A.2d 835 (1975). The one characteristic which distinguishes a property assignment from an award of alimony is the court's duty, pursuant to subsection (c) of § 46b-81, to in addition consider the "contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates." Id.

Both parties, in their respective briefs, acknowledge that the trial court's decision not to award any lump sum distribution as a property settlement was mainly based on its determination that the plaintiff "brought nothing to the marriage and contributed little to it." In the context of the sentence in which these words appear, it is clear that the court was talking about the lack of any monetary contribution.

We realize that whether the parties made a contribution in the acquisition and preservation of property is a question of fact. *Sweet* v. *Sweet,* 190 Conn. 657, 661, 462 A.2d 1031 (1983). At the same time, however, it is apparent to this court that the trial court failed to consider any of the nonmonetary contributions allegedly made by the plaintiff to the acquisition, preservation or appreciation in value of the parties' respective estates. The plaintiff argues that the evidence at trial showed that her major contributions to the marriage were the care and rearing of the minor child and the upkeep of the family home. Our review of the record indicates that the trial court failed to consider (1) whether any of the plaintiff's alleged nonmonetary contributions to the family during the marriage made it possible for the husband to acquire or retain property, and (2) whether the wife's alleged nonmonetary contributions to the family during the marriage

had the effect of preserving the value of already acquired property or appreciating the value of already acquired property.

The issue, then, that this court must decide is whether the phrase "contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates," within the meaning of § 46b-81 (c), contemplates nonmonetary as well as monetary contributions. The statute does not contain a specific definition of the word "contribution," and the word as used in the statute is ambiguous. See *International Business Machines Corporation* v. *Brown,* 167 Conn. 123, 133, 355 A.2d 236 (1974). In light of the fact that an ambiguity exists as to whether it means solely financial contributions, or financial and nonfinancial contributions, such as homemaking services and primary caretaking responsibilities for the minor children, "we must invoke the fundamental rule of construction which mandates that this court ascertain and give effect to the intention of the legislature. *State* v. *Ellis,* 197 Conn. 436, 445, 497 A.2d 974 (1985); *State* v. *Salz,* 8 Conn. App. 125, 141, 515 A.2d 921 (1986). In construing a legislative act, we may consider its history, its language, and the purpose it is designed to serve. *Feldman* v. *Administrator,* 138 Conn. 724, 727, 89 A.2d 210 (1952)." *Hartford Federal Savings & Loan Assn.* v. *Tucker,* 13 Conn. App. 239, 248, 536 A.2d 962 (1988).

In examining the legislative history of § 46b-81, we note that the statutory language directing a court "also [to] consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates" when making an equitable distribution of the property upon dissolution, was introduced into our General Statutes in 1973 by Public Acts 1973, No. 73-373, § 20. Our review of the transcribed comments of the judiciary, house, and senate meetings in which House Bill 8235, entitled "An Act Concern-

ing the Dissolution of Marriage," was discussed, indicates no intent on the part of the legislature to limit the meaning of the word "contribution" to encompass solely financial contributions.[1]

In fact, although the legislative history does not reveal any attempt to define the word "contribution,"

[1] There are several "equitable distribution" statutes in other states which specifically require a court to consider the nonmonetary contributions of a homemaker spouse when making awards of property. See, e.g., Colo. Rev. Stat. § 14-10-113 (1) (a); Ill. Stat. Ann. c. 40, § 503 (c) (1) (Smith-Hurd); Md. Cts. & Jud. Proc. Code Ann. § 3-6A-05 (b) (1); Mass. Gen. Laws Ann. c. 208, § 34 (West); Mont. Code Ann. § 40-4-202; N.Y. Dom. Rel. Law § 236 (McKinney Sup.); Pa. Cons. Stat. Ann. § 23-501 (b) (12) (Purdon Sup.); Uniform Marriage and Divorce Act § 307, 9A U.L.A. The absence of specific reference to a homemaker's contributions, however, should not be construed as implying that such considerations are therefore not required. For example, in *Rothman* v. *Rothman,* 65 N.J. 219, 320 A.2d 496 (1974), the New Jersey Supreme Court construed the state's equitable distribution statute, N.J. Stat. Ann. § 2A:34-23, to include consideration of a spouse's supportive role in the family unit. The *Rothman* court explained: "The statute we are considering authorizes the courts, upon divorce, to divide marital assets equitably between the spouses. The public policy sought to be served is at least twofold. Hitherto future financial support for a divorced wife has been available only by grant of alimony. Such support has always been inherently precarious. It ceases upon the death of the former husband and will cease or falter upon his experiencing financial misfortune disabling him from continuing his regular payments. This may result in serious misfortune to the wife and in some cases will compel her to become a public charge. An allocation of property to the wife at the time of the divorce is at least some protection against such an eventuality. In the second place, the enactment seeks to right what many have felt to be a grave wrong. It gives recognition to the essential supportive role played by the wife in the home, acknowledging that as a homemaker, wife and mother she should clearly be entitled to a share of family assets accumulated during the marriage. Thus, the division of property upon divorce is responsive to the concept that marriage is a shared enterprise, a joint undertaking, that in many ways it is akin to a partnership. *Only if it is clearly understood that far more than economic factors are involved, will the resulting distribution be equitable within the true intent and meaning of the statute.*" (Emphasis added.) *Rothman* v. *Rothman,* supra, 228–29; see also *Parrott* v. *Parrott,* 278 S.C. 60, 62–63, 292 S.E.2d 182 (1982), where the Supreme Court of South Carolina held that even though real property has traditionally been distributed on the basis of title, property titled in the husband's name upon divorce may be awarded to the wife in order adequately to compensate her for her contributions in providing a home for the family unit.

there were comments indicating an intent to require a court to take into consideration all relevant factors necessary to make a fair determination concerning alimony and property settlements. In support of the bill, one legislator stated: "[I]t does in fact for the first time in Connecticut's history treat men and women equal[ly]. *It does provide that the court* look at them not as men and women but as parties and *look at their various obligations in their various capacities* with respect to earning and *all the other aspects* that should be considered." (Emphasis added.) 16 H.R. Proc., Pt. 5, 1973 Sess., p. 1989, remarks of Representative Bernard L. Avcollie. Representative Mary B. Griswold stated: "I was one of the strong supporters of the equal rights amendment for women and I feel that this new divorce law will help the rights of women in this state. . . . I support this bill . . . because I think *it will make it more equitable for the women of the state.* " (Emphasis added.) 16 H.R. Proc., Pt. 12, 1973 Sess., p. 5919, Griswold.[2]

---

[2] On appeal, the plaintiff did not raise any claim or make any argument that the Connecticut equal rights amendment; Conn. Const. art. I, § 20; compels the courts to consider the homemaker's contribution to the acquisition of marital assets as equal to that of the wage earning spouse. See, e.g., *DiFlorido* v. *DiFlorido,* 459 Pa. 641, 331 A.2d 174 (1975); see also Mass. Gen. Laws Ann. c. 209, § 32 (West) (state legislative implementation of its equal rights amendment compels the courts to consider the contribution of a homemaker in making an equitable distribution of property). For a thorough discussion of the law and arguments relevant to this issue, see J. Avner, "Using the Connecticut Equal Rights Amendment at Divorce to Protect Homemakers' Contributions to the Acquisition of Marital Property," 4 U. Bridgeport L. Rev. 265 (1983). The author states that "it can be argued that the state [equal rights amendment] provides a constitutional basis for treating the homemaker spouse and the wage-earner spouse as beginning on an equal footing with regard to division of marital property. From this starting point, the court can then evaluate the other criteria listed in the particular equitable distribution statute or developed through case law and, depending upon application of those criteria to the individual case before it, the actual division of property might shift accordingly away from an equal split to one balanced in favor of one spouse. . . . Thus, this approach reinforces the concept of 'equitable distribution' by assuring legal recognition of the value of homemaker work without removing necessary

The purpose of a lump sum distribution as a property settlement is to make an equitable division of property. *McPhee* v. *McPhee,* 186 Conn. 167, 170, 440 A.2d 274 (1982). A court must, therefore, "unscramble" ownership of property in order to give each spouse what is equitably his or hers. Id. An equitable division of property upon divorce or dissolution envisions that full recognition by the courts will be given to the noneconomic contributions of both spouses. See, e.g., *Artiss* v. *Artiss,* 8 Fam. L. Rep. 2313 (Hawaii Cir. Ct. 1982); *Rothman* v. *Rothman,* 65 N.J. 219, 320 A.2d 496 (1974); *DiFlorido* v. *DiFlorido,* 459 Pa. 641, 331 A.2d 174 (1975); *Paul W.* v. *Margaret W.,* 8 Fam. L. Rep. 3013 (Pa. Ct. Common Pleas, 1981); *Parrott* v. *Parrott,* 278 S.C. 60, 292 S.E.2d 182 (1982).

A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary caretaking responsibilities.

We find that the trial court abused its discretion in failing to consider the plaintiff's nonmonetary contri-

flexibility from the court." Id., 280–81; see also *Cersosimo* v. *Cersosimo,* 188 Conn. 385, 397–98, 449 A.2d 1026 (1982) (in the absence of evidence that either the court at the time of divorce or the court involved in any subsequent modifications did or did not consider the "unpaid service of the wife as homemaker," and in view of the lack of factual predicate to frame the constitutional issue, the wife's gender-based claim of discrimination in acting on her motion for modification of alimony was not properly before the Supreme Court).

butions in the acquisition, preservation or appreciation of property. We hold that a determination of each spouse's "contribution" within the meaning of General Statutes § 46b-81 includes nonmonetary as well as monetary contributions. As such, equity demands that this case be remanded to the trial court to determine whether the plaintiff made a nonmonetary contribution to the marriage and, if so, whether that fact would change its ultimate decision regarding the proper allocation of property.

IV

In its memorandum of decision, the trial court noted that the plaintiff has never held steady employment for any reasonable period of time but that she has had some training toward a nursing career. Although the court determined that no permanent alimony was warranted, it concluded that the defendant "should provide some funds to help rehabilitate the [plaintiff] in obtaining training for a permanent job," and awarded the plaintiff rehabilitative alimony of $200 per week for a duration of two years for the purpose of "enab[ling] the plaintiff to secure necessary training."

The plaintiff argues that the trial court erred in awarding rehabilitative alimony for only a two year period in light of the fact that the uncontroverted testimony of the plaintiff indicated that pursuit of a nursing career required an additional four years of formal education. The plaintiff contends that the periodic alimony order does not serve the purpose for which it is intended and, therefore, it is legally and logically inconsistent with the facts presented.

We first recognize the well established principle that a trial court may exercise broad discretion in awarding alimony as long as it considers all of the statutory criteria enumerated in General Statutes § 46b-82, including length of the marriage, the causes for the dis-

solution of the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of the parties. *Carpenter* v. *Carpenter,* 188 Conn. 736, 742, 453 A.2d 1151 (1982); *Debowsky* v. *Debowsky,* supra, 526. Our review of the record indicates that the trial judge did consider these mandatory factors in determining whether to award alimony.

Although the trial court applied the correct legal standard in its determination of alimony, its determination to award the plaintiff $200 per week for a two year duration was logically inconsistent with the facts as found by it. The trial court found that the plaintiff has never held a steady job, has lived on welfare for a period of time, and is functionally disabled at times due to her medical problems. The court expressed serious doubts as to whether the plaintiff will ever be able to "get on her feet again" and support herself. The court also recognized that the plaintiff has had some training toward being a nurse, that she desired to continue her nursing education, and that four years of training were required to do so. The court concluded that the defendant was financially able to provide rehabilitative alimony and that it was his duty to provide it.

The court emphasized that it was awarding "rehabilitative" alimony. The unambiguous purpose of rehabilitative alimony is to allow the recipient spouse to attain self-sufficiency. Therefore, the duration and amount of rehabilitative alimony should attempt to achieve the purpose for which it was designed. *Markarian* v. *Markarian,* 2 Conn. App. 14, 16, 475 A.2d 337 (1984) (per curiam). In this case, the purpose of the rehabilitative alimony was to allow the plaintiff to finish her nursing training or other training so that she may obtain permanent employment. "Underlying the concept of [rehabilitative] alimony is the sound policy that such awards may provide an incentive for

the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency." Id.

The trial court awarded rehabilitative alimony in order that the plaintiff might become a nurse. The alimony awarded was clearly awarded for an insufficient duration. If the trial court did not contemplate nursing training but rather any training which could lead to permanent employment, then the duration of the award is also confusing. Neither the record nor the trial court's memorandum of decision indicates the rationale underlying the exercise of discretion which it undertook in limiting the alimony to two years. Given the plaintiff's lack of vocational skills and training, and the trial court's conclusions that she is not stable, has had emotional problems, and has never been able to support herself, there is no reasonable basis for its conclusion to limit the payments to a two year period. The alimony award does not serve its purpose as support in that it does not appear to allow the plaintiff enough time in which to attain self-sufficiency. In fact, such facts would appear to militate against time-limited alimony, at least for so short a duration. See, e.g., *Bak* v. *Bak,* 24 Mass. App. 608, 622 n.14, 511 N.E.2d 625 (1987). The trial court even admitted as much as evidenced in its statement: "Well, I've given her a very limited amount as far as rehabilitation is concerned." The award is logically inconsistent with the facts presented; *Vanderlip* v. *Vanderlip,* 1 Conn. App. 158, 160, 468 A.2d 1253 (1984); and, therefore, cannot be upheld.

There is error, the judgment of the trial court is set aside with respect to its orders of custody, counsel fees, property division and rehabilitative alimony and the case is remanded for a new hearing on the custodial and financial issues. Physical custody of the minor child

shall be with the defendant until the trial court has had an opportunity to address the issue of custody at the new hearing.

In this opinion the other judges concurred.