[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This limited contested dissolution action was heard on December 15, 1992.
The defendant wife, whose maiden name was Nancy E. Leith, and the plaintiff husband were married on July 24, 1971. There were five daughters born of this marriage; namely, Carol Ann, born November 5, 1972; Diane, born March 4, 1974; Allyson, born December 16, 1975; Laura, born April 14, 1977; and Nancy, born June 19, 1978. Both parties have resided in Connecticut since 1984.
The husband is forty-nine (49) years old and in good health. He has been employed as a union electrician through I.B.E.W. since September 11, 1963. He graduated from high school in 1967 and took some courses at Nassau Community College. In later years, he secured a Bachelor of Science degree from Dominican College in New York. He is a highly skilled specialist in his trade with particular emphasis on telephone and data services work. On occasion, he is employed as a foreman or assistant foreman on certain jobs.
The parties bought a house in Wyckoff, New Jersey in 1973. Richard was throughout the marriage always a very hard worker. A good example is that he doubled the size of the New Jersey house, doing a great deal of the work himself. He CT Page 64 would have stayed in this house but claims that his wife could not stand it and insisted on selling it in 1984. He claims with typical intensity and some hyperbole that "he hasn't slept a night since" they sold that house. She denies his claim of undue pressure concerning that house. The court concludes that this disagreement does not attribute significant fault to either party but rather is a symptom of a breakdown in communications and trust between the parties that indicates that the marriage was in trouble that far back.
In 1984, they bought jointly an upscale house at 31 Lampost Drive, West Redding Connecticut, where the wife now lives with the children. The family residence is a nine room modern colonial on a two-acre lot in an excellent neighborhood and can fairly be described as luxurious living. The wife claims in her affidavit that it is worth $320,000 with an $82,000 mortgage for a net present total equity of $238,000. The husband claims that the house is worth $350,000 but admits it is hard to say in this difficult real estate market. The husband left the house in March, 1991 and lives in an apartment at 19 Elizabeth Street in Bethel.
The parties also own a summer house in New London, New Hampshire, on a five-acre plot near Lake Sunapee, which they bought in 1983 from their savings. The husband claims this property could be subdivided and is worth about $100,000. The wife raises doubts about the subdivision and puts its value in her affidavit at $75,000 and later in her testimony at about $80,000. It has a $3,000 mortgage on it.
The husband is helping the two oldest daughters with their college expenses to a total this year of $3,600. He resents Carol going to Plymouth State since it costs about $13,000 a year total and she could get at least as good an education at one of Connecticut's state universities, including Western Connecticut University right here in Danbury, at a lower cost. Undoubtedly, Carol must have sound reasons why she wants to be more independent and go to college out of state.
The wife, aged fifty-two (52), is not in robust health. She has been treated for a heart condition and sometimes is troubled with arthritis. She is a high school graduate with one year at a secretarial school. As the children came CT Page 65 along, she devoted full time to being a loving, caring mother for five daughters born in five and a half years, and to tending and managing the growing Ragonese household. The husband, with his usual candor and honesty does not deny that she did a good job. Despite being out of the job market for over twenty years, she was enterprising enough to get a part-time teller's job at the Union Savings Bank where she nets $155 a week. She feels, rightly in this court's judgment, that with the three minor children at home and the older daughters at home when not in college, that she should not work longer hours. She gets $600 a week alimony and child support pendente lite. Although her affidavit shows a weekly need of $1,214, she insists she can get by if she continues to get the $600. The husband feels that he should pay $500 per week but admitted that she needed $600 a week to get by. Thus, he concludes she should work full-time to make up the difference. The court sides with the wife on this issue. She is doing all she can to keep the Ragonese household alive and with the husband's very large income cannot reasonably be expected to work more hours.
This is a good point at which to discuss fault in the breakdown of this marriage. The husband is very conscientious and is proud of what he has accomplished through the years for his family. He has never shirked his responsibilities to his wife and five daughters. He has had in the past and plans in the future no financial self-indulgences whatsoever. When the court discusses the specific awards to be made, it will be seen that what the husband has been doing and proposes to do is honorable and fair except that his offer of the length of alimony is not fair and reasonable under all of the circumstances. This is not necessarily a fault on his part but is rather a fairly typical gender-biased viewpoint of the value to a husband and his family of the wife's bearing and rearing their five children and "keeping the home fires burning" for over twenty years. However, his selfless devotion to his family is outstanding and is aptly illustrated by the fact that he lives in Bethel, gets up at 4:30 in the morning, and commutes to New York City to work. He stays close to the family home so that he can nourish and enjoy healthy family relations with his daughters, particularly the three minors who spend every weekend with him cooking and enjoying family life together. CT Page 66
To return to his complaints: (1) the pressure to move from New Jersey; (2) lack of sex for five years; (3) her ungratefulness for all he has done for her and the family; (4) her neglect of him, (5) his great annoyance at her delay in paying bills, yet he faithfully continued to give to her his full pay checks, only asking for certain designated amounts of cash each week for his incidental needs. She counters that he is the one who stopped marital relations, starting after she had her tubes tied after her fifth child was born. She says that through the years he was indifferent to her and he started to come home later and later, a change which he admits. She is very self-effacing and complained very little about her husband. She just kept plodding along doing her thing as a loyal homemaker. In a nutshell, an unhappy couple that couldn't reverse a long slide in their relationship which led to an irretrievable breakdown of the marriage some years ago. The court, as stated during the trial, finds that neither party was at fault as a factor to be considered in making the necessary awards.
The court has previously expressed admiration for the husband's stalwart qualities and unparalleled devotion to his family. His values, under questioning from the court, not necessarily in order, are family, country, union and catholic church. He admitted to be prideful, saying when questioned by the court that "he has a lot to be proud of." A necessary corollary of his overall scale of values is a certain rigidity of viewpoint that must necessarily color his view of the marriage.
Before discussing the parties' positions concerning the issues before the court, two underlying themes must be explicated. First, his income and earning potential are very high while the wife's earning potential is very limited. Chief Judge DuPont of the Appellate Court, in a landmark decision in O'Neill v. O'Neill 13 Conn. App. 300, 311,536 A.2d 978 (1988) stated:
 A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division CT Page 67 incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary caretaking responsibilities.
Secondly, the Supreme Court of Connecticut in Blake v. Blake,207 Conn. 217, 232, 541 A.2d 1201 (1988) stated that "[o]ur courts have frequently considered the standard of living enjoyed by spouses in determining alimony or in dividing marital property." (Citations omitted.) The court went on to state that "[o]ur courts have also considered the parties' standard of living in determining child support payments." (Citations omitted.) Although the Ragonese family did not live extravagantly with frequent travel, expensive jewelry, or luxury cars, for example, with a very nice home in Redding and a summer home in New Hampshire, they clearly had a comfortable, if not high, standard of living.
The court will now rule on appropriate orders in view of the criteria set forth in General Statutes, Sec. 46b-81
(assignment of property and transfer of title), Sec. 46b-82
(alimony) and 46b-84 (parents' obligation for maintenance of minor child).
The court finds that the marriage has broken down irretrievably. The marriage is dissolved on the basis of irretrievable breakdown.
CUSTODY
Custody of the minor children shall be awarded to the wife subject to reasonable, liberal and flexible visitation rights to the husband. This has worked fine so far, all credit being given to the parents who have made this possible.
ALIMONY AND SUPPORT
The husband shows on his affidavit of November 16, 1992 a net weekly wage of $811 a week. Yet, to his credit he is entirely current on pendente lite orders of $600 per week. The $811 net figure is not a realistic one for three reasons. He also receives additional income from the union of about CT Page 68 $8,000 a year. Secondly, despite a slump in his trade, he usually works most of each year. Thirdly, the court must consider the availability to him of additional funds from his total fund balance with the union as of March 31, 1992 (Plaintiff's Exhibit A): (a) restricted annunity fund from which he cannot draw, $55,245.05; (b) additional annunity from which he can and has drawn, $32,915.44; (c) 401K Fund, $16,628.42. Thus, he has some leeway.
Most importantly, the husband's current income is not at all typical of his regular income or earning capacity. His adjusted gross income for the most recent five years is as follows: 1987 — $102,000; 1988 — $114,974; 1989 — $85,319; 1990 — $93,800; 1991 — $85,481. His earnings, though somewhat impaired now, remain strong and promising.
The husband proposes that he pay alimony of $100 per week for six years only. It is not necessary to recite each of the statutory criteria to demonstrate that this simply is not fair. Together with this amount, he proposes $400 per week child support until the youngest child, Nancy, reaches age eighteen (18) on June 19, 1996, which sum is substantially more than that required by the Child Support Guidelines. He claims that this will be sufficient to allow the family to stay in the Redding house until that date. But he agreed that the wife could only make it if she receives $600 a week, unless she works full-time, which this court has found to be an unreasonable request.
In setting alimony and support, the court must weigh the husband's strong declared intent to enable the Redding household to continue until the youngest daughter is eighteen (18). So determined is he to provide for his children that he volunteered to the court that he would do all that he could to help with each child's education and is even looking forward to the necessary expense of a loving father as each child may become married. With two households to run, it is going to be a tight squeeze but with the good faith shown so far by both of the parties, it is doable.
The wife claims support in accordance with the guidelines and alimony of $350 per week to cease on her death, cohabitation as defined by statute or upon his retirement. The husband is ordered to pay to the wife for child support the sum of $400 per week, and alimony in the CT Page 69 amount of $200 per week until the youngest child, Nancy, reaches eighteen (18) on June 19, 1996. Thereafter, the husband is ordered to pay the wife alimony of $300 per week until his or her death, her cohabitation as defined by statute, or upon the husband's retirement.
MEDICAL COVERAGE
The husband shall provide medical insurance for the benefit of the minor children. All unreimbursed medical, dental, and other necessary expenses incurred on behalf of the minor children shall be equally divided by the parties. The husband shall cooperate in procuring a COBRA election for the wife, but the cost of the medical insurance for said coverage shall be the responsibility of the wife.
HUSBAND'S PENSION
The wife is awarded one-half of the husband's pension upon his retirement adjusted to the date of dissolution by way of a Qualified Domestic Relations Order.
REAL ESTATE
(a) New Hampshire
The wife insisted in her proposed orders and in testimony and argument at trial that the court should first find the value of the New Hampshire realty to be $80,000, then add this to the approximately $105,000 that the husband has in his Fund Balance with the union and divide the total in two so that to even things up the husband would owe the wife a "kicker" of $12,500 plus his interest in the real estate. This is not an unreasonable request but in view of the substantial burdens imposed by the court in this opinion, the court declines to require such a payment. The husband shall quitclaim his interest in the New Hampshire property to the wife and she will indemnify and hold harmless the husband from any charge in connection therewith. The husband is furthered ordered to pay off the mortgage on the New Hampshire property forthwith.
(b) Redding Property
The parties are substantially in agreement on this CT Page 70 item. The property shall be listed for sale the first week of January, 1996 at an agreed price. If the parties cannot agree on the price or other matters concerning the sale, either party may petition the Superior Court for a ruling in the matter. Possession is not required to be given the purchaser until July 1, 1996. Any major or unforeseeable heavy expenses involving the house will be shared by the parties in such proportions as the court shall determine is reasonable in the light of the circumstances then prevailing. The wife is ordered to pay all carrying charges and customary expenses concerning the house until it is sold. The court has given much thought to a fair division of the proceeds of the sale after the customary deductions. The wife started at 85 percent and came down to two-thirds during the trial. The husband remains at a 50/50 split. The court notes that the wife is well protected in this case, having a present net worth of $172,000, which will increase before the sale by her getting the New Hampshire real estate, and by reduction of the mortgage in Redding, and by the award of ample alimony and pension rights. The court must not unreasonably impair the husband's capital lest he lose incentive to work so faithfully for his family. He reports a net worth of $307,000. His new net worth will be $40,000 to $50,000 lower than earlier computed by reason of the transfer of his interest in the New Hampshire real estate. A 60 percent share to the wife and a 40 percent share to the husband is ordered.
MISCELLANEOUS ORDERS
A. Each party will pay its own counsel fees.
B. All personal property is awarded to the wife except purely personal things to be kept by the husband.
C. Each party will retain motor vehicles currently owned.
D. Each party will retain bank accounts shown on the affidavits except that the Ridgefield Bank CD in the amount of $1,243.91 is to be turned over to the wife.
E. Each party will retain any other assets that appear on the affidavits. CT Page 71
T. Clark Hull, State Trial Referee