[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
The parties are before the court for a dissolution of their marriage of thirteen (13) years. Each is now forty-nine (49) years old and in good health. There are no children. Each party was ably represented by counsel, appeared at trial and testified over numerous days. The court observed their demeanor and evaluated their credibility. Other witnesses were called and numerous exhibits were introduced — virtually all related to financial issues — i.e., business trout and loss statements, business and personal federal tax returns, bank records, etc. Each party submitted a sworn financial affidavit, demands for relief, and post-trial memoranda. The principal issues are the distribution of real and personal property and the extent, if any, of the wife's interest in the husband's business and her request for alimony.[1]
The parties met and dated briefly in 1972. They remained friends but did not begin again to date until 1983 or 1984, by which time he was living in Ohio in a home he owned and she was living with or nearby her family in New York. They married on April 18, 1987, in Mamaroneck, New York; each was then thirty-five years old and neither had been previously married. The husband was then unemployed but was receiving monies by way of a severance package made available to him when his father's restaurant chain was sold. He was a high school graduate with one and one-half (1 1/2) years of college and he had, by then, had several jobs in the restaurant industry, one of which was at a Columbus, Ohio, restaurant owned by his father's former company, Dean Neat Packing Company. He had also previously worked for the Far Nest Services restaurant chain where he completed their management training program. Mrs. Dean then held an Associate's Degree from the Fashion Institute of Technology and had been employed for tour and one-half (4 1/2) years with Aide Decor in New York as an interior designer. She had also been an allied member of the American Society of Interior Design.
The couple moved into the plaintiff's father's house in New Rochelle after he remarried. They paid no rent; the husband remained unemployed CT Page 77 for the year while there. She and a friend began a design company and she worked there for approximately nine (9) months. When the father's house was sold, they moved to Ohio believing the husband's employment opportunities were better there. Instead, he worked as a waiter/bartender for six (6) months or so, earning $17,506 in 1990 (plaintiff's 35). The plaintiff was unhappy there — primarily because she was separated from family at a time when her sister was experiencing suicidal ideation and her father had disowned both the plaintiff and her sister and because the hope her husband would open his own restaurant in Ohio was not realized. A year or so later, in November of 1990, they moved to Connecticut where they rented a large house in Fairfield for six and one half (6 1/2) years. The plaintiff worked during that time doing residential design for Expressions in Greenwich.
For the first four to five (4-5) years in Connecticut, the husband worked at only two (2) jobs — as a server at Boston Chicken for five to six (5-6) months and as a waiter at Chart House for some four (4) months. In 1991, he earned $7,712 at Chart House while she earned approximately $9,500 from two (2) jobs (plaintiff's 36 — Form 1040). In 1992, he had no employment income while she earned $14, 889 (plaintiff's 37 — Personal Exception Worksheet) from two (2) jobs; her interior design company (Kathy Dean Interior Design), established in 1990,[2] generated gross revenue of $117,494. She also did whatever was required to maintain the household. The unrefuted testimony was that she left for work daily at 9:00 a.m. while the defendant remained in bed until 11:00 a.m. or so, having stayed up late most nights. Though happier in this state than she had been in Ohio because she was able to do design work, she nevertheless felt "lonely."
Communications between husband and wife deteriorated and the evidence was that they engaged in sexual relations only "a couple of times" during their first two (2) years in this state. They engaged in couples and individual counseling during that time; the wore encouraged Participation in sex therapy but testified the husband eschewed it. Her complaints during this period and the following years were myriad. She indicated she wanted children; his testimony was he never felt a strong desire to have children. Yet, her asserted desire for children is questionable. She admitted to having strongly negative feelings and fear of both hospitals and labor induced pain. Though she went to a fertility clinic on 1996 and was advised she should undergo certain medical procedures to promote pregnancy, she in fact did not have them. She also admitted to having had multiple abortions, one of which "could" have resulted in the termination of the life of this defendant's child. Ultimately, she came to embrace the possibility of adopting a child — more of which will later here be addressed. The plaintiff testified to coming home from her job daily only to find her unemployed, at-home husband had not attended to even CT Page 78 such tasks as feeding the dogs. She was critical or his personal hygiene, testified he let their medical insurance lapse, and stated he demurred at getting her prompt medical care when she required the same.
In June of 1992, the parties established Dean Restaurant Group, Inc. ("DRG"), a Connecticut corporation. Mr. Dean was President, Treasurer, and the sole shareholder;[3] Mrs. Dean was Vice-President and Secretary (plaintiff's 36). While the plaintiff testified she believed she was part owner of that company;[4] it is clear she never was. In August of 1992, the company purchased the assets of New England Donut, Inc. (plaintiff's 2)and entered into a lease agreement with Norman Pollock to rent the premises at 580 Post Road, Fairfield, at $2,500 per month triple net. The monthly mortgage is paid by DRG. The couple planned to open a restaurant named "Well Dressed Chicken." The wife arranged for a friend to put together a concept/organizational package and turned to preliminary concept plans but the husband never followed through beyond the leasing of premises because he by then realized his chance of success was optimized by his participation in a franchise program which would dictate operations. He earned no employment income in 1993 or 1994 and she continued to be the family provider.[5]
By 1995 or 1996, the wife testified he had become abusive to her and that one or more incidents resulted in police coming to the house. No evidence of physical abuse was offered through the plaintiff did offer a taped conversation in which the defendant, allegedly upset with regard to removal of financial documents from the home, was generally out of control, yelling and screaming and uttering gutter language.
Neither party earned any income in 1995; the only sources of income were trust income to Mr. Dean in the amount of $24,084 and cash gifts from his parents at Christmas ($10,000 from his mother and $1,000 from his father). Mrs. Dean's testimony was that she was unable to work that year for medical reasons requiring treatment in New York. She did, however, enroll in a real estate course to increase her employment opportunities and she began work as an independent real estate agent in 1996. In that year, she earned gross income of $8,934 — most of which came from her real estate activities and some small portion from her design business (plaintiff's 41). The defendant earned no income in either 1996 or 1997. She grossed $17,000 from her real estate efforts in 1997.
In August of 1998, the defendant entered into a franchise agreement in which Dean Restaurant Group was the franchisee of a restaurant to be known as LaSalsa operated on the Post Road property (plaintiff's 8). He signed all such documents as "President", was designated as "Principal", and he signed a personal guaranty (plaintiff's 8, page 32). In September CT Page 79 of 1998, the restaurant opened and it continues to operate. He is the manager of that restaurant, earning gross weekly income of $800 and netting $629.35 weekly. He testified he had no health, pension, or retirement plan and that his only other income consists of the Christmas cash from his parents. Despite the transfer of stock to the mother, she has no active involvement in the restaurant, coming there only to lunch[6] every couple of months. The defendant performs all restaurant management duties — the hiring and firing, depositing of monies, payment of bills, working with the accountant regarding tax filings, etc. While the plaintiff argues his income from the business is greater than he claims and points to the inclusion on the defendant's 1999 personal return of $25,000 characterized as a "management fee"[7] as proof of additional income, the court rejects that conclusion. Martin Cannon, a Certified Public Accountant who prepared the parties' personal returns and the corporate returns of DRG,[8] testified the defendant did not personally receive that amount. instead, he testified the corporation (DRG) had made loans to the defendant in the form of advances permitted him when the defendant was not drawing a salary and the inclusion of the "Management Fee" on Mr. Dean's personal return represented the corporation's only hope of achieving the repayment of those loans. The corporation gets the writeoff and the corporate debt is thereby reduced. Nor can it be said the defendant personally benefits from that debt reduction (except to the extent his continued employment by DRG is dependent upon the restaurant's financial health) because his mother has been the owner of the stock since 1995. It is, however, so that not only does the restaurant continue to do well[9] but the testimony was that the defendant has been exploring sites for new restaurants prior to this action having been filed.
The court does not conclude the transfer of stock to Mary Sue Dean was to remove the business from consideration as a marital asset since the transfer occurred two (2) years prior to the wife's first filing of a dissolution action in 1997 nor does the court conclude that, once this action is resolved, the mother will transfer the stock back to the defendant and his yearly income will immediately swell. Given the Prior actions of Mary Sue Dean with regard to business matters, her cautious gifting of cash to this couple during the many years of her son's unemployment and/or limited employment, and her obvious recognition of her son's lack of ambition,[10] it is clear she has always felt the need to retain control over monies made available to this defendant and to restrict the opportunities available to him to squander her assets. To conclude all of that will change merely by virtue of this dissolution entering is to ignore all of the evidence offered by the past and is to engage in speculation. This is not to suggest, as the defendant urges, the plaintiff did not make a meaningful contribution to her husband's restaurant activities and to the opening of LaSalsa specifically. She was CT Page 80 actively involved in the early planning, was instrumental in its design concept, acquired furniture and cabinetry, chose the color scheme, met with various local officials regarding such matters as compliance with local health regulations, and, on the day prior to the restaurant's scheduled opening, traveled to Massachusetts to obtain the required trash receptacle to permit that opening. It is thus the case the plaintiff made a substantial contribution to the acquisition — albeit not financial — of the asset from which the defendant earns his livelihood. While the plaintiff has no legal interest in DRG, she has a cognizable equitable interest. It is, however, patently clear to this court there is no possibility this plaintiff, were she to be awarded any interest in DRG, could work harmoniously either with the defendant or his mother, and it would be nothing short of mischief to award her any interest in the same.
The couple purchased a home at 1095 Prospect Drive in Stratford for $430,000 on April 8, 1996. That price was entirely financed by a loan from United Jersey Bank. Each party signed the mortgage note and deed (plaintiff's 12) and the loan was secured by the property and the Garry Taylor Dean Lifetime Trust ("Trust"). The defendant conceded at trial the plaintiff legally held one-half interest in that property and he does not contest an award to her of one-half the net proceeds from the sale of the home (The plaintiff asks she be awarded the entirety of the property after the defendant has been ordered to make current the outstanding mortgage and tax payments.). The plaintiff's appraisal established a market value of $673,000 (plaintiff's 31); the defendant's appraisal determined the market value to be $630,000 (defendant's 1). The court finds its value is $652,500. The Trust consistently paid the mortgage and taxes through March of 2000; after the parties appeared to argue pendente lite motions on March 14, 2000,[11] no further payments on the mortgage and taxes were made.[12] It is relevant that the defendant, on his financial affidavit of that date, indicated his obligation to pay $751 monthly for the mortgage and taxes.[13] When those payments were terminated, the principal mortgage balance was $419,261 (plaintiff's 23). In July of 2000, counsel for United Jersey Bank sent the plaintiff (who has remained in the home since he moved out in December of 1999) a default notice. The mortgage was assigned to Eastern Financial WA., Inc. on August 25, 2000, and, since that time, no further action has been asserted by the mortgage holder. The plaintiff has made no financial contribution to the acquisition or maintenance or preservation of this asset. Her present interest is as a result of her mother-in-law's guaranty and the monthly payments from the Trust created by the defendant's parents before the parents' divorce and the marriage of these parties. In fact, the plaintiff is a co-obligor on the mortgage. That aside, the plaintiff cannot afford to carry the house. Her financial affidavit shows net weekly wages of $393 — or $1,696.50 monthly, CT Page 81 considerably less than is required to pay monthly mortgage and tax payments of $3,229.86 (plaintiff's 23). Despite the plaintiff's testimony she believes she can earn twice as much income than she did this year over the next year, it is unrealistic to believe she can carry the house on her earnings. Her further testimony that she believed she could rent a room in the house for $700 a month is equally unconvincing; despite her employment as a real estate agent in the locale of the marital site, she was unable to state whether the zoning ordinances in that location permitted the renting of space to an individual unrelated by blood or marriage. Nor can the defendant afford to keep the house. The issue of payment of back mortgage and taxes was reserved to the time of trial (plaintiff's 33, page 10). It is more than mere coincidence that the Trust stopped making the payments after the court hearing in March, 2000, which established pendente lite payments — particularly since the husband had vacated the premises on December of 1999 and such payments continued through March of 2000. On April 4, 1996, the husband wrote United Jersey Bank "requesting" invasion of the Trust for payments required under the mortgage loan. That that was done for almost three (3) years yet stopped in April of 2000 was, this court finds, the intention either of the defendant or his mother and done with this litigation in mind. Relevant is that the Trust document (plaintiff's 11) required the Trustee (one Duane Getty) to distribute to each beneficiary,[14] during his or her lifetime, all of the trust income as often as quarterly each year and so much of the principal at such times and in such amounts as the Trustee in its sole and absolute discretion shall determine to be necessary and appropriate. Mary Sue Dean was one (1) of the two (2) settlors of that Trust and it is also relevant that she continues to pay her son's rent at the Fairfield Motor Inn where he now resides, which rent is $375 a week. Though the defendant testified he had not received any income distribution from the Trust since April of 2000, it is clear he continues to be the beneficiary of his mother's cash distributions by way of these rent payments and that he will again — at such time as she and/or the defendant considers it appropriate — receive the distributions guaranteed by the language of the Agreement so long as he is alive and the Trust has income. That Trust had a value of $364,126 on September 30, 2000.[15] The defendant's ability to acquire assets and income is greater than that of the plaintiff — whether that be by gifting or trust distribution.[16]
Much was made at trial of the number of Dean Trusts once or presently in existence. Mrs. Mary Sue Dean's attorney's (Joseph R. Torre, Esq.) letter of November 2, 1999, (plaintiff's 9) established the only trust known to generate income on an annual basis is the Dean Lifetime Trust, which trust set up the fund known as the Garry T. Dean Lifetime Trust as above discussed. No other trust fund was established as relevant to this action. CT Page 82
From October of 1998, the plaintiff had use of a Land Rover which Mary Sue Dean owned. The vehicle has not been operational for the better part of a year. At one time, the taxes were not current and it could not be registered. The insurance was also not kept current. From January of 1999 to June of 1999, the plaintiff was required to depend on others for rides or to rent a vehicle. In February of 1999, the court ordered Mr. Dean to provide the Land Rover to the plaintiff. Instead, he offered a high mileage vehicle the plaintiff testified had bald tires. Of recent date, the plaintiff has been driving her stepmother's car because, although the Land Rover has been returned to her and the taxes, insurance and registration are now current, it requires $5,000 in repairs to be road ready. She is, therefore, in need of a vehicle which can be safely driven so that her livelihood is assured.
In late spring of 1997, the plaintiff began a sexual relationship with a co-worker, Edmund Reeves. Though she testified on October 31, 2000, her relationship with him was over, inexplicably she testified on November 1, 2000, they were back together again after some period of separation. The couple spend some nights together at the Prospect Drive marital home. Mr. Reeves is presently in the middle of his own dissolution, which action pends in this courthouse. Mr. Dean claims it was this affair and her keeping it secret from him for many months that led to the breakdown of the marriage. She claims she began the affair because she was lonely, starved for affection and companionship, and because her husband abused her — primarily because of his neglect of her emotional and physical needs and his general unwillingness to accept responsibility for their financial needs. Her commencement of this relationship with Mr. Reeves was followed two (2) months later by her filing of an action for dissolution in July of 1997. She took no action with regard to that matter and the parties continued to live together in the marital home though sleeping in separate bedrooms. She offered that the husband would then buy groceries only for himself and cut off long distance telephone service to the home. Beginning in the summer or early fall of 1997, she began to be seen at a local domestic violence crisis center and she continued such visits — though sporadically — until the defendant moved out in December of 1999. Testimony regarding physical violence directed to her while both remained in the home was notably absent though her portrayal of this defendant was that of an emotionally cold and occasionally cruel person. Her direct trial testimony was that she withdrew the first action because she wanted to "make things right" with her husband but cross-examination established her deposition testimony on August 11, 2000, was that she withdrew the first action because she "got caught" — a reference to her relationship with Mr. Reeves. She persisted at trial that August testimony was untrue. She stated she brought this second action in July of 1999 because of her CT Page 83 husband's continued abuse and his denial to her of the Land Rover.
Each of these parties contributed to the breakdown of the marriage. The defendant lacked self-motivation and personal confidence and the family trust facilitated his failure to achieve financial independence for his family. Interestingly, he has sustained the longest period of employment (since September of 1998 ( in their marital history and LaSalsa does well under his management. The difference now is that the plaintiff's interest lies elsewhere and she has sufficient confidence in her own abilities to no longer want to expend her energies trying to save this marriage. Her infidelity contributed significantly to the breakdown but, in view of her contribution to the couple's finances, her running of the household, and her role in making LaSalsa a reality, it cannot be said her desire to terminate this marriage is unreasonable. While each accuses the other of a lack of interest in sex and an inability to show affection, it is apparent the couple never shared a commonality of interests or exhibited toward the other the kind of unselfishness required to make this union other than dysfunctional. The plaintiff testified that, even late into this marriage and at a time she alternately described the marriage as "rocky" and "volatile", she wished to pursue adoption (presumably for the same reason she had undergone multiple abortions — to avoid confrontation of her fear of hospitals and the pain of labor and delivery). For whatever his reason then was, the defendant did not embrace the concept. This is, however, telling of the plaintiff's own inability to evaluate surrounding circumstances and apply sound judgment. When asked at trial why she would wish to pursue bringing a child into this household given the turbulance of their relationship, Mrs. Dean's response was, "Worse relationships than ours have had children." It is perhaps this same sense of denial that prompts the plaintiff to believe she could financially support the marital property if awarded the same.
In formulating proper orders in this case, the court must consider the factors set forth in §§ 46b-81 and 46b-82, together with the provisions of § 46b-62 regarding attorney's fees. The court has considered all of these factors in making its determinations and has considered all of the evidence, the parties' demeanor and credibility, their financial affidavits, claims for relief, memoranda of law, and all of the applicable case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account," Scherr v. Scherr, 183 Conn. 366,368 (1981), this court will not recount those statutory criteria and the evidence other than as has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria."Weiman v. Weiman, 188 Conn. 232, 234 (1982) The court must consider all the statutory criteria in determining how to divide the parties' property CT Page 84 in a dissolution proceeding. Lee v. Lee, 197 Conn. 1, 5 (1985). The court need not give equal weight to each factor. Kane v. Parry, 24 Conn. App. 307
313-14 (1991). With specific regard to property assignment and what alimony award, if any, is appropriate, the court is mindful our alimony statute does not recognize an absolute right to alimony. General Statute § 46b-82; Thomas v. Thomas, 159 Conn. 477, 487 (1970). As to alimony, it has been said, "The primary basis for the award of alimony has been not to punish . . . but to continue the duty to support the other. . . ." Toby v. Toby, 165 Conn. 742, 748 (1974). In making financial determinations, the financial circumstances, both actual and potential, are entitled to great weight. Valente v. Valente, 180 Conn. 523,530 (1930) In Blake v. Blake, 207 Conn. 217, 230 (1938) our Supreme Court cited with approval the language of O'Neill v. O'Neill, 13 Conn. App. 300,311 (1988) regarding property division as follows:
 A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial efforts to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated on a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities . . . .
Regarding counsel fees and § 46b-62, the plaintiff has submitted an invoice from one of her prior counsel, Attorney Daiga Osis, in the amount of $7,850.25 for the period beginning April 5, 2000, and ending June 8, 2000 (plaintiff's 29). Additionally, her present counsel, Attorney Robert Nicola, has submitted an affidavit and an invoice for services for the period beginning July 7, 2000, and ending October 31, 2000, in the amount of $16,329 (plaintiff's 32).[17] She also requests, in her memorandum of law dated December 6, 2000, an award of costs of $475 due and owing to Vimini's Associates for its appraisal of the market value of the marital property (plaintiff's 43) though that request is not iterated in her demand for relief of October 24, 2000.
The court, in addition to the foregoing, finds as follows:
1. There is the requisite jurisdiction.
2. The allegations of the complaint have been proved and are true. CT Page 85
3. There has been an irretrievable breakdown of the marriage.
4. Both parties have contributed to the breakdown of the marriage.
5. The court finds an arrearage of temporary alimony in the amount of $600 as of November 17, 2000, and continues to be due and owing at the rate of $200 per week through December 29, 2000.
The court enters the following orders:
1. A decree of dissolution of marriage shall enter on the grounds of irretrievable breakdown of the marriage.
2. The plaintiff is returned to her maiden name of Kathy Iolean Gundelach.
3. The defendant shall make current temporary alimony owed in the amount of $1,800 within fifteen (15) days of the date of this order.
4. The defendant shall make current all outstanding mortgage and real estate tax payments on 1095 Prospect Drive in Stratford including any penalties or late charges bringing said mortgage on the marital home current. That shall be accomplished within thirty (30) days of the date of this order.
5. The marital property shall be placed on the market within thirty (30) days of this date by a listing agent/realty company chosen by the plaintiff. The plaintiff shall have sole use and possession of the property until the date of sale. On the date of sale, the plaintiff shall receive sixty percent (60%) of the net proceeds of the sale and the defendant shall receive the remaining forty percent (40%) of one net proceeds.
6. Once the defendant has made current the mortgage and taxes on the home as per number 4 above and until the date of sale, the plaintiff shall be responsible for sixty percent (60%) of the mortgage and taxes monthly and the defendant shall be responsible for forty CT Page 86 percent (40%) of the monthly mortgage and tax payments.
7. The defendant shall pay all outstanding legal fees owed by the plaintiff to both Daiga Osis, Esq. and Robert Nicola, Esq.
8. The defendant shall immediately remove the Land Rover from the marital property at his expense, if any, and the plaintiff shill not be liable for any outstanding loans, taxes or insurance on said vehicle.
9. Each party shall retain his/her own personal effects and clothing remaining in the marital home. Thereafter, all personal property shall be divided. If the parties cannot amicably resolve the division of property, they may mediate the same.
10. The defendant shall pay to the plaintiff by way of lump sum alimony the sum of Thirty Thousand Dollars ($30,000), Fifteen Thousand Dollars ($15,000) of which shall be paid on or by January 15, 2001, and the remaining Fifteen Thousand Dollars ($15,000) to be paid on or by February 15, 2001. This sum is by way of maintenance and support for the plaintiff and is not to be considered as dischargeable in bankruptcy.
11. Each party shall pay the other the sum of $1.00 per year alimony for the purpose of indemnifying the other from any and all debts and taxes the parties are ordered to pay herein. That amount shall be modifiable only if a party fails to indemnify the other on account of debts or taxes provided for herein. This alimony shall terminate only upon the death of either party.
12. The defendant shall retain all interest in Dean Restaurant Group, Inc., and LaSalsa — to include all business equipment — and all interest in the Carry T. Dean Lifetime Trust free and clear of any claim by the plaintiff and he shall indemnify and save her harmless with regard to any debts or claims regarding the same. He shall be responsible for all tax obligations — past and present — with respect to that restaurant and CT Page 87 all income received from the Trust from this date forward.
13. The defendant shall be solely responsible for all state and federal income taxes owed by the parties for the years 1987 through 2000 and he shall indemnify and save harmless the plaintiff on account of any federal or state income tax liability that may be claimed against her during this period on account of any tax returns filed by the husband — either jointly or individually — or any business, partnership, corporation or other entity in which he was involved. The parties shall provide each to the other whatever documents — or copies thereof — in his/her possession and necessary to the filing of any state or federal income tax returns nor yet filed.
14. Those liabilities listed on the parties' October 31, 2000, financial affidavits shall be wholly the responsibility of the party executing the affidavit with the exception of the plaintiff's listing of $2,450 owed the IRS for 1999 (which debt shall be the defendant's as per number 10 above) and each shall indemnify and save harmless the other from any claim or demand thereof.
15. Except as herein otherwise provided, each party shall retain the assets listed in his/her financial affidavit of October 31, 2000, free and clear of any claim or demand by the other. The exception to this provision shall be those items listed as assets on the plaintiff's affidavit; those items shall be subject to distribution as per number 9 above.
16. The plaintiff shall maintain her own medical insurance at her expense.
17. Each party shall assume the cost of his/her own expert appraiser and other expenses incident to this litigation, the single exception being the plaintiff's counsel fees as above awarded.
18. The defendant shall pay his own attorney fees.
19. The plaintiff shall retain possession of the family CT Page 88 dogs, Happy and Barkly.
SO ORDERED this date, January 2, 2001.
B. J. SHEEDY, JUDGE