[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties intermarried on June 22, 1980 in Cherry Hill, New Jersey. They have resided continuously in the State of Connecticut for at least one year preceding the date of the filing of this complaint. There is one child, issue of the marriage, Matthew Lee Brown, born June 16, 1985.
Throughout the trial, the court listened to the witnesses and reviewed all the exhibits in the case. In addition, the court has carefully considered the criteria set forth in General Statutes, Secs. 46b-56, 46b-62, 46b-81, 46b-82, 46b-84
and 46b-86(b) in reaching the decisions reflected in the orders that follow.
The court has also weighed the holding of the Appellate Court in O'Neill v. O'Neill, 13 Conn. App. 300, 311, cert. denied,207 Conn. 806 (1988) wherein the court said as follows:
A property division ought to accord value to those nonmonetary CT Page 3861 contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary caretaking responsibilities.
See also Blake v. Blake, 207 Conn. 217, 230-31 (1988).
At the time of the trial, the plaintiff husband was forty-two (42) years old and the defendant wife was thirty-nine (39). Both were in good health, although the plaintiff has been diagnosed as having slightly elevated blood sugar levels.
The plaintiff received his M.B.A. from Temple University in Health Administration. He was employed in that field at the time of the marriage and held several positions at different health institutions throughout the marriage. His salary increased with each new position. Today, he is employed by St. Lukes Hospital in Newburgh, New York, as executive vice president and chief operations officer, and earns $112,000 per year.
The defendant obtained a Master of Education at the University of Pittsburgh. At the time of the marriage, she worked for a Philadelphia organization which provided training modules to schools. She then worked for the City of Pittsburgh as a personnel administrator. Subsequently, she was employed at a hospital where she continued to train employees and work as a training coordinator.
When the plaintiff obtained a position in New Jersey, and the family moved, the defendant worked on a part-time basis as a consultant for her Pennsylvania employer.
The defendant's earnings rose during the years she worked full-time. However, when her son was born in 1985, the defendant reduced her working hours. Both parties agreed that their child's care and welfare took precedence over the defendant's career.
When the plaintiff obtained a new job in Connecticut, the defendant worked as a consultant for Learning International in Stamford developing curricula and training materials. She stopped working as a consultant in her field in 1991. CT Page 3862
Until 1990, the defendant had pursued an interest in theater by appearing in community shows. In 1990, she decided that she wanted to pursue a career in acting and modeling. The plaintiff believed in her talent. He encouraged her and was supportive of her endeavors. The parties agreed that they could reduce their living expenses so as to absorb the financial impact of the defendant's career change. Since then, the defendant is occupied full-time in pursuit of this career. She travels to and from auditions and modeling jobs in various locations. She reads through scripts, learns lines and takes occasional lessons to better prepare herself.
In 1994, she earned approximately $24,000. As a full-time training consultant, she earned approximately the same amount. Therefore, the court finds that the defendant has demonstrated an earning capacity of approximately $24,000.
Both parties agreed that their marriage had broken down irretrievably. The defendant had been unhappy in the marriage for a longer period of time than the plaintiff. The parties had entered counseling but it did not produce the results the defendant desired. The plaintiff was not sufficiently aware of the depth and extent of his wife's dissatisfaction with the marriage. In 1990, the defendant met Raymond Michaud, an actor and singer. The plaintiff alleges that the defendant became sexually involved with Michaud in January, 1993, while the defendant counters that she became sexually involved with him in November, 1993. The more credible evidence shows that by January, 1993, the defendant and Michaud were in love with each other and began a sexual relationship. It serves no purpose for the court to point to phrases in Michaud's letters and poetry sent to the defendant between January and May, 1993, to illustrate this finding. Daily telephone conversations ensued for which the plaintiff was billed. The defendant saw Michaud socially at least two times per week and on many weekends. The plaintiff learned of the relationship when the defendant did not return home one evening but returned home at 5:30 the next morning. The parties sought counseling to reconcile their differences. However, when the defendant continued to see Michaud, the plaintiff refused to attend counseling sessions.
The plaintiff filed this action for dissolution in April, 1993. Until December, 1993, the defendant had telephone, mail and personal contact with Michaud, sometimes while her husband and/or CT Page 3863 her son were at home. In December, 1993, she left the home with her son and rented a home in Newtown. She later moved to another rented home in Newtown. Michaud has been a frequent overnight guest, often present when the plaintiff picks up or drops off his son while exercising visitation. Michaud makes no financial contribution to the defendant's household expenses.
Based on the foregoing, the court found that the marriage had broken down irretrievably. The marriage was dissolved on the grounds of irretrievable breakdown on December 23, 1994, by the agreement of the parties, with the understanding that other related orders would follow in the court's memorandum of decision. Accordingly, the following orders may enter:
1. The parties negotiated an agreement embodied in the stipulation dated September 30, 1993. The parties were ordered to comply with the stipulation on November 1, 1993 (Mihalakos, J.). A copy of the stipulation is attached hereto. The parties request that this court approves the stipulation and order that it be incorporated into this judgment.
The court commends the parties for entering into the arrangement thereby providing the child with a measure of certainty and security.
The stipulation of the parties as to custody and visitation becomes the orders of this court. It is incorporated by reference into this decree.
2. Alimony. The plaintiff shall pay to the defendant the sum of $975 per month until the earliest of the following events occur:
(a) his death;
(b) her death;
(c) her remarriage;
(d) her cohabitation pursuant to statute;
(e) five years from the date of this decree.
3. Child Support. The plaintiff shall contribute the sum of $250 per week as and for support of the minor child, Matthew, CT Page 3864 until Matthew completes the twelfth grade or attains the age of nineteen (19), whichever event first occurs, or until his death or emancipation. This amount complies with the Child Support Guidelines.
In addition, the plaintiff shall pay one-half of the following expenses of the child — all clothing purchases, all tennis lessons, summer camp expenses, hair cuts, and educational expenses.
4. Medical Insurance. The plaintiff shall maintain medical insurance for the benefit of the minor child so long as he has the duty to support the minor child. Unreimbursed medical expenses of the child shall be shared by the parties equally.
The husband shall cooperate in the event the wife elects COBRA coverage through his employer.
5. Life Insurance. So long as the plaintiff has an obligation to provide child support, he shall maintain life insurance in the amount of at least $100,000 for the benefit of the minor child. So long as he has an obligation to pay alimony, he shall maintain the two Prudential policies naming the defendant as beneficiary.
6. Within ninety (90) days of this decree, the defendant shall quitclaim her interest in the marital domicile to the plaintiff. The plaintiff shall pay her the sum of $15,000 in consideration of this transfer. He shall be responsible for paying the mortgage and hold her free, harmless and indemnified thereon.
7. Personal Property. The parties have divided their furnishings and personal possessions to their mutual satisfaction. The remaining personal possessions are to be divided as follows:
A. The wife shall retain the 1994 Nissan automobile.
 B. The husband shall retain the 1991 Acura automobile and hold the defendant free, harmless and indemnified on the Acura car lease.
 C. Each party shall retain the bank accounts, bonds and securities he/she holds in his/her individual name. CT Page 3865
 D. All the retirement accounts of the parties shall be divided equally between them, except that the Danbury Hospital pension shall be subject to a Qualified Domestic Relations Order (QUADRO) which grants the defendant a 50 percent interest in that pension as of December 23, 1994. The court shall retain jurisdiction until the QUADRO is approved.
 E. The husband shall be given credit for any sums which represent the amount he contributed to other retirement accounts after the filing of the divorce through April, 1993.
8. Taxes.
 A. The parties shall alternate the dependency exemption for the minor child so that in the even numbered years, the defendant shall receive the exemption and in the odd numbered years, the plaintiff shall receive the exemption.
 B. The defendant is ordered to file an amended joint tax return for the calendar year 1993. It is understood that the plaintiff shall hold the defendant harmless from any and all claims arriving out of the joint filing. Any refund of payments made with regard to the balance due shall be the property of the plaintiff.
9. The plaintiff shall be responsible for the liabilities shown on his financial affidavit, and he shall hold the defendant free, harmless and indemnified against any claims arising from these liabilities. The defendant shall be responsible for the liabilities on her financial affidavit, and she shall hold the plaintiff free, harmless and indemnified against any claims thereon.
10. Counsel Fees. The plaintiff shall pay to the defendant the sum of $2,500 in counsel fees.
11. All other claims for relief, not expressly addressed herein, have been rejected.
The court commends both attorneys for their lucid presentations of their clients' cases.
Judgment may enter accordingly.
Leheny, J. CT Page 3866
ARTICLE II: CUSTODY AND VISITATION
2.1 The Husband and Wife agree that each of them is a fit and proper person to have the responsibility for the care, custody, and education of the minor child. The parties further agree that they desire to remain the joint legal custodians of the minor child subject to the following considerations:
 (a) Residential Care. The primary residence of the minor child shall be with the Wife.
 (b) Definition of Joint Custody. It is the intention of the parents in agreeing to joint legal custody that each of them shall have a full and active role in providing a loving environment; and agree to consult with one another regarding the health, education, and welfare of the child, whose well-being and development shall, at all times, be the paramount consideration. In accepting the broad grant of privileges conferred by this joint custodial arrangement upon each of the parents, they specifically recognize that these powers shall not be exercised for the purpose of frustrating, denying, or controlling the other parent in any manner. The parents shall exert their best efforts to work cooperatively in future plans consistent with the best interests of the child and in amicably resolving such disputes as may arise.
 (c) Schedule of Physical Custody and Visitation. The parents agree that during the following alternation of custody, the custodial parent shall for that period of time have the primary day-to-day responsibility for the guidance and upbringing of the child. At the outset the parents agree that the custody of the child by the parents shall be on a four week rotation schedule as follows:
 (i) First Week: The child shall be with the Mother from Sunday morning until Friday morning and with the Father from Friday afternoon through Saturday night.
 (ii) Second Week: The child continues with the Father from Sunday morning until Wednesday morning and with the Mother from Wednesday afternoon through Saturday night.
 (iii) Third Week: The child continues with the Mother from Sunday morning until Friday morning and with the CT Page 3867 Father from Friday afternoon through Saturday night.
 (iv) Fourth Week: The child continues with the Father from Sunday morning through Wednesday morning and with the Mother from Wednesday afternoon through Saturday night.
 (v) During the school year the Father shall be entitled to one visit with the child during the scheduled time that the child is in the Mother's custody. This visit shall take place upon reasonable notice and by mutual agreement and may occur any time until 8:00 p.m.
 (d) Holiday and Vacation Time. Holiday and vacation time shall be allocated between the parents as follows:
 (i) Thanksgiving Day and the Friday thereafter shall be alternated commencing with 1993 to the Father.
 (ii) There shall be a division of Christmas vacation so that whoever does not have the child Thanksgiving Day shall have the child on Christmas Eve through December 28. The other parent would have the child December 29 through January 1.
 (iii) Winter and Spring school vacation periods would be alternated between each parent commencing with Winter 1994 to the Mother.
 (iv) The child shall spend from 9:00 a.m. until 8:00 p.m. on Mother's Day with the Mother and from 9:00 a.m. until 8:00 p.m. on Father's Day with the Father regardless of the weekly schedule.
 (v) From 9:00 a.m. on Sunday until 8:00 p.m. on Monday of Memorial Day weekend would be with the same parent who had the Winter vacation.
 (vi) From 9:00 a.m. on Sunday until 8:00 p.m. on Monday of Labor day weekend would be with the same parent who had the Spring vacation.
 (vii) During the child's summer vacation from school, custody of the child shall be on a one-week rotation schedule, from Friday evening to the following Friday CT Page 3868 evening. Said schedule shall commence on the first Friday following the last day of school and continue until the Friday of the week prior to the start of school. The child shall resume his four week rotation schedule so that he will begin school from the alternating parent's home commencing with the mother in 1994.
 (viii) During the child's summer vacation from school, both parents shall be entitled to one mid-week visit with the child during his scheduled time with the other parent. The visit shall occur at a time mutually agreed upon by both parents.
 (ix) The Father and Mother may each have up to two consecutive weeks of vacation with the child in accordance with the above-mentioned summer vacation schedule. The parents shall inform each other of the vacation dates by May 1 so that camp and/or other recreation plans can be made without conflict. During the child's two week vacation period with either parent, the mid-week visit with the alternate parent may be skipped unless otherwise arranged by mutual agreement of both parents.
 (e) Delegation of Physical Care to Other Parent. Each of the parents may freely delegate or entrust to the other the care of the child for whom he or she would otherwise have the primary responsibility. Both parties agree to be reasonable and flexible both with respect to requesting and consenting to adjustments to the custody and visitation schedule. They further agree that they shall communicate directly, and not through the child, in making any schedule adjustments. The child shall be informed, by either or both of the parents, of any changes in the above custody and visitation schedule.
 (f) The Father shall exercise visitation with the child in the home of the Mother only with the prior express consent of the Mother. The Mother shall exercise visitation with the child in the home of the Father only with the prior express consent of the Father.
2.2 Affection. Each of the parents shall exert every reasonable effort to maintain free access and unhampered contact between the CT Page 3869 child and the other parent and to foster a feeling of affection between the child and the other parent. Neither parent shall do anything which may estrange the child from the other, or injure the opinion of the child as to their Mother or Father, or which may impair the natural development of the child's love and respect for each of the parents.
2.3 Communication. Each of the parents shall be entitled to copies of any reports from third persons or institutions concerning the health, education, or welfare of the child, as follows:
 (a) Each parent shall be entitled to complete, detailed information from any pediatrician, general physician, dentist, consultant, or specialist attending the child for any reason whatsoever and to be furnished with copies of any reports given by any of the latter, to the other parent.
 (b) Each parent shall be entitled to complete, detailed information from any teacher or school giving instruction to the child, or which the child may attend, and to be furnished with copies of all reports given by any of them, to the other parent.
2.4 Review. The amount, duration, and times of the custody and visitation schedule shall be reviewed and/or renegotiated by the parents upon the happening of any of the following contingencies:
(i) The schedule proves to be problematic for the child.
 (ii) If either parent changes his or her principal residence to a location more than twenty-five (25) miles from Newtown, Connecticut (written notice of any intended change shall be given at least 60 days in advance of the intended move).
 (iii) Physical or Mental Disability or impairment of one of the parents.
2.5 Disputes. In the event any dispute or disagreement arises regarding the terms and conditions of custody as set forth herein, the parties agree that they will first attempt to resolve the problems themselves, and where necessary, amend the Agreement in writing, signed by both of them. If they are unable to resolve their differences after using their best efforts, the parties agree to jointly seek the advice of a mutually CT Page 3870 agreed upon mediator for resolution of the conflict. Neither party shall seek or institute proceedings for the modification of this custody arrangement by litigation without first having so sought and attempted to resolve their conflicts through mediation.