[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
ORDER FOR MODIFICATION AND CLARIFICATION OF DECISION RE:COMPLAINT FOR DISSOLUTION OF MARRIAGE
The court hereby modifies paragraph 2.b of its decision rendered October 10, 1996, so that paragraph now orders as follows:
 b. A contingent wage execution order, applicable to the defendant, shall enter pursuant to General Statutes § 52-362.
This modification is necessary in order to clarify and permit implementation of paragraph 2.a of the court's decision rendered October 10, 1996, which provided express directives for the defendant's direct payment of child support to the plaintiff in this matter.
BY THE COURT,
N. Rubinow, J.
MEMORANDUM OF DECISION RE: COMPLAINT FOR DISSOLUTION OFMARRIAGE
RUBINOW, J.
This memorandum of decision addresses financial issues raised by the parties in connection with the dissolution of their marriage.
The plaintiff husband commenced this action for a dissolution of the parties' marriage on the ground of irretrievable breakdown. The writ and complaint were returnable to court on October 26, 1993. Thereby, the plaintiff also sought custody and support of the parties' two minor children, alimony, counsel fees, an equitable division of the parties' marital assets and liabilities, a specific order for conveyance of any right held by the defendant in property known as 70 Claire Hill Road in Burlington, Connecticut[1], and such other equitable relief as the court might find pertinent. Under date of October 21, 1993, the defendant wife filed an answer admitting the allegations of the complaint and submitting to the jurisdiction CT Page 8614 of this court. The defendant also filed a cross-complaint seeking a dissolution of the marriage, custody and support of the minor child, an equitable division of the parties' property, counsel fees, an order directing the plaintiff "to pay all of his debts which were cosigned by the Defendant," and such other legal equitable relief as may apply.
On November 3, 1993, Atty. Kathleen Murrett was appointed to represent the children. Both parties timely participated in appropriate parenting education programs, to their credit. Custody issues were thereafter considered through the Regional Family Trial Docket where, on September 22, 1995, Judge Steinberg approved the parties' agreement as to custody, visitation and parenting issues. Judge Steinberg also granted the parties' request for dissolution of their marriage on that date: pendente lite child support orders were continued, while further financial orders were specifically reserved for trial at the Superior Court in Hartford. At this time, the plaintiff was represented by counsel, and the defendant appeared pro se.[2]
Trial of this case commenced on April 4, 1996. Both the plaintiff and the defendant were represented by counsel throughout this hearing. Each party testified, and submitted financial affidavits, documentary evidence, and proposed orders for the consideration of the court. The court file reflects a "Notice of Bankruptcy" that had been submitted on behalf of the defendant under date of January 4, 1996. Neither party requested a resolution of the claim, raised through this motion, that trial should be stayed pending further order of the U.S. Bankruptcy court: accordingly, the matter proceeded. Certain evidence was produced at trial relating to the issue of the defendant's bankruptcy status. In addition, following the completion of the evidence, defendant's counsel advised the court that although certain creditors have been satisfied through a portion of the debtor/defendant's estate, the bankruptcy case "remains open", notwithstanding the defendant's position as having nominally been discharged in bankruptcy.[3]
 I
In reaching its decision, the court has considered all of the requisite statutory criteria, together with the equitable and taxable consequences of the financial awards set forth below.
A
CT Page 8615
The court applied the principles of General Statutes §46b-81(a) in considering this case. That statute provides that "[a]t the time of entering a decree annulling or dissolving a marriage . . . the superior court may assign to either the husband or wife all or part of the estate of the other." The court also applied those factors set forth in § 46b-81(c), which it must consider in dividing the marital estate, including: the causes for the dissolution of the marriage, the age and health of the parties, their station and occupation, amount and sources of income, employability, vocational skills, estate, liabilities, needs and opportunity for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates." § 46b-81(c).
In this matter, the court has also reviewed and applied the principles set forth in O'Neill v. O'Neill, supra, 13 Conn. App. 300.O'Neill v. O'Neill held that an equitable distribution of property should take into consideration contributions made to a marriage by a spouse who does not work outside the home, "including homemaking activities and primary caretaking responsibilities." O'Neill v. O'Neill, supra, 13 Conn. App. 311. "A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. Theinvestment of human capital in homemaking has worth and should beevaluated in a properly division incident to a dissolution ofmarriage." (Emphasis added.) Id., 311.
 B
In reaching its decisions concerning support of the minor child, the court observed the maxim that its paramount concern is directed at serving the best interests of the child. See, e.g.,Hall v. Hall, 186 Conn. 118, 121-122 (1982). In entering its support orders, the court considered the tax implications for the parties, the applicable common law, and the Child Support and Arrearage Guidelines enacted pursuant to § 46b-215a of the Connecticut General Statutes.[4] The court also followed the appropriate statutory criteria. General Statutes § 46b-56(c) requires that "[i]n determining whether a child is in need of support and, if in need, the respective abilities CT Page 8616 of the parents to provide support, the court shall take into consideration all of the factors enumerated in § 46b-84." Those factors include: "the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child." § 46b-84(c).
 C
The court has acknowledged and applied the common law criteria relevant to assessment of the parties' vocational skills, employability, and earning capacity. In the context of family matters, "[e]arning capacity . . . is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." Lucy v. Lucy,183 Conn. 230, 234 (1981). "In appropriate circumstances in marital dissolution proceedings, a trial court may base its financial awards on the earning capacity rather than the actual earned income of the parties . . . Such circumstances include those where there is evidence that a party voluntarily quit or avoided employment in his or her field of expertise and where there is evidence of that party's previous earnings." (Internal citations omitted; citations omitted.) Paddock v. Paddock,22 Conn. App. 367, 371 (1990). See also, Lucy v. Lucy, supra,183 Conn. 234. The court may base such financial orders on a determination of earning capacity even if there is no showing that avoidance of gainful employment was willfully accomplished for the purpose of reducing an obligation to pay support. SeeWilkens v. Wilkens, 10 Conn. App. 576, 580 (1987). Any award of support, based on a party's capacity to earn income, "requires that party to continue to work or find other sources of income to meet the obligations of the court's order." See Lawler v. Lawler,16 Conn. App. 193, 204 (1988).
 D
In this matter, the court was called upon to determine whether, as claimed by the defendant, adoption subsidies received by the parent of a "special needs" child should be included in the calculation of that parent's income available for child support purposes. General Statutes § 17a-116 establishes the CT Page 8617 definition of a "special needs child" whose adoptive parents may receive subsidies from the commissioner of children and families upon assumption of caretaking responsibilities. Section17a-117[5] establishes the circumstances under which such subsidies will be allocated, and enumerates the three types of available subsidies, which include: medical benefits,
terminating when the special needs child reaches age 21; lump-sumpayments to address a distinct anticipated expense; and periodicsubsidies, paid to the adoptive family until the child's 18th birthday, which subsidies cannot exceed the current costs of foster maintenance care. Section 17a-118 requires an annual review of all subsidies paid by the commissioner of children and families, who is responsible for ending or reducing the payments. It is the last category of subsidies that has been brought to the court's attention in this case.[6]
Neither legislation nor court opinion in this state has yet established whether such subsidies should be considered "income" to the recipient parent for purposes of determining the amount that parent should contribute to child support. Section 46b-215a-1 (11) of the Child Support and Arrearage Guidelines identifies that "gross income" which the court is to consider as available to a parent obliged to support a child. Certain governmental payments, such as Supplemental Security Income[7]
and "federal, state and local public assistance grants"[8]
are specifically excluded from the calculation of income available for payment of child support. Adoption subsidies paid pursuant to § 17a-117 are neither included, excluded nor referenced in any specific way by the language of the guidelines.
This court recognizes, however, that such subsidies are intended to provide direct assistance to adopted children with specific, identifiable "special needs": the adoption subsidies are not intended to provide general financial aid to parents or relatives who live with and care for these children. As such, despite its delivery to the adoptee's lawful parents, the subsidy is for the effective use of the individual, identified special needs child. Accordingly, the court finds no basis for including adoption subsidy payments, made pursuant to § 17a-117, as parental income for purposes of determining an obligation to contribute to child support.
This determination is supported by the legislative history of No. 86, § 2 of the 1972 Public Acts, codified at § 17a-117. That provision established the concept of CT Page 8618 adoptions which would be subsidized through payment of state allotments. It is clear that this legislation was designed to encourage adoption of hard to place children by offering financial support and incentive to prospective, capable adoptive parents. Representative Brown spoke in favor of this legislation. He stated: "A hard to place child is one who is, in the opinion of the Welfare Commissioner, difficult to place because of a handicap, a physical disability or some other reason that would prevent or make it most difficult for this child to be placed. And therefore, under this bill, it would give the Welfare Commissioner a chance to designate such a child as hard to place and as a result, provide special subsidies and financial support for prospective, adoptive parents." 15 H.R. Proc. Pt. 3, 1972 Sess., p. 4061.
It is also interesting to note that prior to its amendment in 1986, § 17a-117 read, in pertinent part, as follows: "(a) If (1) a child for whom adoption is indicated cannot, after all reasonable efforts consistent with the best interests of the child, be placed in adoption through existing sources because the child is a hard-to-place child and (2) the adopting family meets the standards for adoption which any other adopting family meets,except that it is unable to assume complete financialresponsibility for the child's care, the commissioner of children and youth services may . . . provide one of the following subsidies . . . (B) a periodic subsidy which is a payment to the adopting family whose financial resources are unable to meet theneeds of the child completely and will probably remain so."
(Emphasis added.) The language emphasized in this statutory excerpt was deleted through No. 86-330 of the 1986 Public Acts: the act is silent as to the reason for that deletion, as is the legislative history. It seems likely, however, that the legislative redaction of this emphasized language was intended to enlarge the roster of potential adoptive families by making subsidies for special needs children available to any qualified parent who wishes to accept such a child into his or her home, regardless of financial circumstance. With subsidies offered to address the special needs of each child, rather than the needs of adoptive families, all family units would be encouraged to adopt special needs children without the burden of assuming costs beyond those ordinarily associated with child-rearing or adoption of children without specifically identifiable needs. With this amendment, wealthy families, middle class families, as well as financially disadvantaged families, would all be offered equal incentive to adopt special needs children. Most importantly, the CT Page 8619 legislation would enhance the likelihood that the specific requirements of these special needs children could be met, by addressing the subsidies to the children's needs, and not to the needs of families who adopt them.
From this analysis, it is clear that the court should not include any state payments or subsidies received for support of a special needs child in the calculation of parental income from which ordinary child support obligations are determined. A parent who has adopted a special needs child remains financially responsible for the general food, shelter, clothing and incidental needs of the adopted child and his or her children other children, as well. The subsidies granted under § 17a-117 appear to be the legislature's recognition of the additional cost that likely will be incurred by families who adopt a child with special needs. If the subsidy provided by the state for an adopted special needs child is considered income of the custodial parent for purposes of determining that parent's capacity to pay child support in a dissolution action, the incentive effect of the specific financial support assigned by the state for the care of that child by virtue of the subsidy will be vitiated, or even eliminated. This court cannot condone that practice. In the absence of an express directive to include
special needs adoptive subsidies as "gross income" for guidelines purposes, the court declines the opportunity to do so and will, instead, exclude this amount from calculation of parental income.
 II
From the evidence presented, the court finds the following facts, which serve as the basis for its decision and orders in this case:
The plaintiff husband was married to the defendant wife on July 10, 1982. Their first child, Megan, was born issue of the marriage on July 5, 1984.[9] Thereafter, the parties adopted their son, Wesley, who was born November 5, 1985. Before his adoption, Wesley had been identified by the state of Connecticut as a "special needs" child, due to his birth to a cocaine-addicted mother, and due to his diagnosed attention deficit-hyperactivity disorder. The state of Connecticut provides a stipend of $140 per week for Wesley's care, given his status as a "special needs" child.
A
CT Page 8620
The plaintiff, who is forty-eight years old, has been employed in the building trades throughout his adult life. He is a high school graduate, and received an associates degree in business at Northwestern Community College in 1986. He served in the United States Air Force from 1966 through 1970: this entitles the plaintiff to receive medical care through the veteran's administration.
For approximately thirteen years, the plaintiff worked at Miner Lumber company, performing estimating, delivery and purchasing work, and developing great skill and expertise in the field of home remodeling and reconstruction. The plaintiff voluntarily left this employment in 1985, approximately three years after his marriage to the defendant. Miner Lumber Company had maintained a retirement plan for the plaintiff which had required neither him nor his spouse to make contributions. When the parties married in 1982, the plaintiff's retirement plan had an approximate value of $22,000. When the plaintiff left the lumber company, he had accumulated approximately $48,000 as the gross cash value of the retirement plan. This fund was retained by Miner, and allowed to accumulate interest and to appreciate, until that business closed, whereupon the plaintiff rolled over the retirement fund into an IRA deposited at Advest.[10]
In 1972, the plaintiff had purchased the Claire Hill property from the estate of a deceased family member. He has lived at Claire Hill since its purchase: the defendant joined him to live there with him until she left this state. After the parties' marriage in 1982, they subjected Claire Hill to nearly total renovation, adding significant living space to the premises, including a sun room and a garage. An above-ground swimming pool was added to the premises during the summer of 1995: this enhancement resulted from a one-time gift to the plaintiff from a friend and neighbor. Prior to the dissolution of their marriage, the defendant had quitclaimed to the plaintiff any interest she held in the Claire Hill property. Until the summer of 1993, the parties each contributed, in relatively equal shares, to the financial support and general care of their children and their household. The defendant paid for food and clothing; the plaintiff paid for all additional expenses, including mortgage, utilities, gas and insurance. In 1992, the defendant contributed to payments for utilities and mortgages, as well. CT Page 8621
In 1985, the plaintiff opened a business which specializes in kitchen and bath remodeling. Since that time, he has remained engaged in work with this company, known as Creative Kitchen and Bath, Inc.[11] The plaintiff has been president of the corporation since its inception. His responsibilities include design, sales, coordination of installation, and financial management of the corporation. This work is similar to the work the plaintiff performed while employed by Miner Lumber Company. The plaintiff owns 51% of CKB's shares. Compensation for corporate employees is decided by agreement of the plaintiff and his two partners: these decisions are made on a monthly basis, and the plaintiff plays a significant role in determining whether CKB funds are to be used to pay salaries, including his own; to reimburse loans or make interest payments on corporate loans, including those for whom he is a creditor; and in all other matters.
The plaintiff receives personal use of a company vehicle, with maintenance and gasoline paid for by CKB. This use is valued at $5200 per year. In addition, the company pays approximately $1500 as insurance for the vehicle used by the plaintiff. The plaintiff now works over fifty hours per week at CKB, usually Monday through Saturday. The plaintiff tries to avoid working each and every weekend, to enable him to spend additional time with his children.
Both CKB and the plaintiff have encountered serious business difficulties, which have been clearly apparent since at least 1989. These difficulties were derived in part from the downward status of the economy in the state of Connecticut, and in part from a former partner's misappropriation of business funds,[12] and a partner's failure to timely pay approximately $40,000 in accumulated payroll taxes due from the company. The plaintiff borrowed $38,000 from his personal line of credit at Connecticut Bank and Trust to resolve this tax debt, and paid the government during late 1989 or early 1990.
Despite his efforts to improve the business, the plaintiff has derived income in decreasing and inconsistent amounts from CKB in recent years. In 1990, the company paid the plaintiff $24,360 as salary. In addition, he received $5,042 in interest on a personal loan he had made to CKB in the amount of $62,000: the terms of this loan required CKB to pay the plaintiff 12% simple annual interest. In 1991, the plaintiff received $18,270 in salary from CKB, plus a total of $7,440 as interest due on the CT Page 8622 personal loan. In 1992, the defendant received $17,400 in salary due to him, plus approximately $6820 as interest on the loan. In 1993, the plaintiff received $30,450 as salary, plus $7440 as interest. In 1994, the plaintiff received $17,400 as salary from the business, plus $5,580 as interest on the loan. In 1995, his gross salary from CKB was $8,700. He received only $1,100 from CKB in 1995 as interest on the personal loan he had made to that business. There was no evidence presented which could support a conclusion that the plaintiff had received a distribution of CKB's profits during any of these years. While CKB maintains some accounts receivable and a limited amount of cash on hand, there inadequate evidence presented from which the court could conclude that the corporation had accumulated any net profits available for distribution during these years. Indeed, the evidence reflects that the business has carried forward substantial losses for a number of years: the loss reported in 1994 exceeded $250,000.
The defendant admitted that the prognosis for increasing or even continuing CKB sales is extremely bleak, given strong competition from discount home centers and more successful elite kitchen and bath remodeling companies which operate in the same geographical area as CKB. The court finds that CKB has a maximum total value of $200,000, with one half that amount as business inventory (display models) and one half as accounts payable or receivable.
The plaintiff is a party to a number of notes which were obtained in an effort to keep CKB afloat. While this indebtedness may represent an accumulation of business error on the plaintiff's behalf, he remains exposed to legal liability as the result. On the other hand, as discussed, the evidence reveals that CKB is obligated to reimburse the plaintiff for the $62,000 personal loan plus interest as referenced above. The plaintiff had used marital funds, including loans secured by Claire Hill, as the source for this loan. CKB had also entered into a contract, or corporate resolution, which required the enterprise to pay the provide the plaintiff with the following compensation on an annual basis: $45,000 as salary, full use and maintenance of a motor vehicle, and family medical expenses. The defendant claims that the plaintiff has wilfully constructed his business affairs, and has misrepresented his relationship with CKB, so that despite its ability to honor these contracts, CKB has withheld payments due the plaintiff. There was no evidence presented from which the court could conclude that CKB is CT Page 8623 financially capable of honoring the obligation to meet principle or interest payments due on the plaintiff's loan at the present time, nor that the corporation is capable or likely to be capable of honoring the salary promised to the plaintiff. Furthermore, there was no evidence presented from which the court could conclude that the plaintiff has successfully camouflaged his relationship with CKB, or that his access to compensation according to the aforementioned corporate resolution should be considered a valid component of his capacity to earn income and accumulate assets.[13]
On March 31, 1993, the plaintiff executed a note establishing a loan from the Small Business Administration (SBA), ostensibly for the purpose of enhancing the potential for CKB's financial success. While CKB was to be the ostensible payor on the note, the defendant voluntarily co-signed the guarantee executed by the plaintiff to secure this loan: this established the parties' initial liability in the amount of $145,000. Approximately $116,000 remains to be paid on this note.[14]
The plaintiff is currently earning approximately $3.41 per hour as his total compensation from CKB. The plaintiff admitted that this rate falls below the minimum wage, which was $4.25 at the time of trial. While he has stubbornly refused to close the doors of CKB, due to his voiced allegiance to his two business partners, the plaintiff admitted that he will probably be forced to lose his financial interest in the Claire Hill property, where his children live, as the result of his persistence with this unsuccessful business endeavor.
Thus, there was no evidence presented from which the court could conclude that CKB will ever recover from its current financial hardships. There was ample evidence, however, from which the court concludes that the defendant's continued relationship with CKB leaves him financially irresponsible toward his children, underemployed, and available for more remunerative employment.
 B
The parties have been actively involved in other financial and real estate transactions throughout the course of their marriage: they have spun a haunting web of sales and purchases, mortgages, promissory notes, and occasional redemption of debt. In 1984, the parties jointly acquired a "time share" right to use CT Page 8624 residential recreational property located in Sedona, Arizona. In 1988, at a cost of $25,000, they purchased acreage in Union, Maine. This property, which was held jointly, was acquired with a down payment of $9,000: the plaintiff thereafter made mortgage payments applicable to this property from his income and wages. The parties also jointly purchased property located on Route 166A in Castine, Maine, at a cost of $74,000. The down payment on this property was derived from the sale of stocks held jointly by the parties. The debt remaining on this property totaled approximately $68,000.
The parties voluntarily restructured their joint debt in November 1989 by refinancing the Claire Hill property to obtain $175,000 in available funds. At the time of this transaction, the plaintiff was well aware of the heavy, and thereto before unforseen, tax burden faced by CKB. The parties planned to move to Maine and establish their residence in that state after CKB was rejuvenated and that business could be sold.
From the inception of this loan through July 1993, both the plaintiff and the defendant contributed toward the debt accrued as the result of this refinancing. During this period, the plaintiff paid approximately $50,500 on the debt; the defendant paid approximately $37,500 on this account. Since that time, all payments on this loan have been made by the plaintiff.
As the result of the Claire Hill refinancing, over $70,000 was made available for the plaintiff's business accounts. Approximately $16,500 of the available funds were directed to pay off the only mortgage that had burdened the Claire Hill residence before the refinancing. Some $10,500 was used to pay off the debt outstanding to Valley National Bank for the Arizona "time share", so that after the refinancing, the parties owned this property interest jointly and outright. Other funds were directed at the real estate the parties held in the state of Maine: approximately $68,000 was used to redeem the remaining debt on the real property at Route 166A in Castine, Maine, leaving the parties with outright ownership.
In October of 1990, the defendant purchased property at Hatch Cove, also in Castine, Maine,[15] in her own name, without any titular interest held by the plaintiff. The purchase price for this property was approximately $72,450. Of this amount, a partial payment of approximately $26,450 was obtained by the defendant from her parents: the remaining debt was CT Page 8625 financed, with the defendant holding the balloon purchase money mortgage in her name, alone.
Following the refinancing of Claire Hill, in 1989 or 1990, the plaintiff quitclaimed all his interest in the Union, Maine acreage to the defendant. The defendant subsequently sold this property in December of 1993, retaining the net proceeds of approximately $15,000 for her own use and benefit without distribution to the plaintiff. At approximately the same time, the plaintiff quitclaimed his interest in the Castine, Maine property to the defendant. It was the plaintiff's understanding that notwithstanding his transfer of interest in these properties, so long as he was married to the defendant, they would remain marital assets: he obtained this information from consultation with an attorney practicing in the state of Maine.
At some time in 1991, the defendant moved to Maine to run a bed and breakfast establishment. This project lasted for only one season, and the defendant failed to renew the lease she had undertaken on the establishment involved. She incurred approximately $26,000 of credit card debt in connection with this endeavor. The defendant paid off this debt in full through proceeds from this business, and through part-time employment as a nurse with the Department of Corrections.
In approximately 1992, the defendant sold one half of the Route 166A property in Castine, Maine, receiving $29,000. The defendant expended a total of $8,000 of this amount to pay joint credit card and family debt. The plaintiff received no direct use of the remainder of these funds, although a portion was directed at the mortgage delinquency then existing on the Hatch Cove property. In March of 1993, the defendant sold the remaining one half interest in the this property for approximately $39,000. The plaintiff received no direct use of these funds, although it was used to redeem the mortgage debt outstanding for Hatch Cove.
During November of 1992, the parties jointly commenced construction of a home on the Hatch Cove property. The plaintiff assumed that the parties would occupy this homestead during their retirement years, based on conversations he had with the defendant during the late 1980's. They had elected to build at Hatch Cove because the defendant liked this property best. The plaintiff contributed some physical labor to this construction, including the addition of kitchen cabinets and preparation of the bedrooms. By the summer of 1993, all six rooms designed to CT Page 8626 provide living space in the traditional bow-style house had been nearly completed; interior trim and a back deck had yet to be constructed. The parties had contemplated addition of a garage and breezeway at a later time.
At this time, title to the Hatch Cove property has come to be held by the defendant's father alone, or by the defendant's mother and father jointly. This transfer of marital property was made in 1993 by the defendant's quitclaim of her interest in the property, without the plaintiff's permission or foreknowledge, and while the property was under the control of the defendant. The plaintiff admits that the defendant's parents contributed over $150,000 toward the construction of the home at Hatch Cove. The children visited Maine in 1995, and stayed with their mother and her new husband in the home at Hatch Cove. This home had an approximate retail market value of $250,000 at the close of 1995.
 C
To support himself and the children, instead of procuring reasonably remunerative employment, the plaintiff began making substantial withdrawals from his retirement account in 1994. This account was worth approximately $103,000 at that time. The plaintiff made these withdrawals with full knowledge of the significant financial penalties and tax implications of prematurely using these for income purposes before he reached retirement age. He utilized that portion of this account which represented assets accumulated since 1982, or during the course of the marriage, without the advice or consent of the defendant. During the calendar year 1994, the plaintiff used $22,623 of gross withdrawals from the retirement fund to make mortgage payments on the Claire Hill property, to support the children, to pay his personal taxes, and to pay his attorney. From 1995 through the time of trial, the plaintiff had withdrawn nearly the entire remainder gross retirement funds. By these means, the once substantial IRA had been reduced in value to approximately $8,000 at the time of trial.
The plaintiff admits that he has nearly exhausted all funds available for support of his family, and that his business is not likely to provide a viable resource for the family's support in the near future. Nonetheless, he has failed to search for or to find adequate employment. There was no evidence from which the court could conclude that the defendant suffers from poor physical health, nor from any impediment to full-time work CT Page 8627 independent of his relationship with CKB. The court finds that the defendant is employed well below his earning capacity, given his extensive knowledge and experience in the building trades and in retail sales. Based on these factors and his earnings history, the court finds that the defendant has the capacity to earn income at a rate of not less than $25,000 per year.[16]
 D
That defendant is forty seven years old, and in good health. She remarried in November of 1995: her new husband has resided with her at the Hatch Cove house for approximately two years. The defendant's current husband, who works as the director of maintenance at Brewer Automotive Components, contributes to her household necessities, thereby lessening her burden. Since 1993, the defendant has occupied the Hatch Cove house without cost to her. While she claims to be obligated to pay rent to her family, the owners of this property, but she has never made such a payment during her occupancy, and was unable to produce any writing which commemorated this obligation. The defendant values this rental at $230 per week. The court finds that the owners of the Hatch Cove property have consistently and regularly provided gifts to the defendant in the manner of forgiveness of this rental obligation. The court considers such gifts to be "income" for purposes of determining the defendant's ability to contribute to the support of her children. See Tremaine v. Tremaine,235 Conn. 45, 66 (1995); Rubin v. Rubin, supra, 204 Conn. 239; Scherv. Scher, 183 Conn. 366, 369 (1981).
The defendant is a registered nurse who is currently employed at Bucksport Regional Health Center on a forty-hour per week basis. She is very well-educated in her field, having received a BSN degree from Boston University, and having received a MPH degree from The Tulane University: these degrees were earned before the marriage. The defendant is licensed as a primary nurse practitioner in the state of Maine, which entitles her to work in positions requiring her to prescribe medications independent of a physician's advise and consent. The defendant is no longer licensed in any professional capacity in Connecticut, although she had gained substantial work experience as a nurse in Connecticut prior to her move to Maine. This work involved outreach nursing through St. Francis Hospital, and school nursing at the elementary and undergraduate levels. She had worked in various nursing jobs throughout her marriage to the plaintiff, including work as a school nurse and for the Department of CT Page 8628 Corrections as mentioned above. The defendant earns approximately $44,000 a year in her current position, which the court finds to represent her earning capacity.
The defendant had owned real property in North Carolina before her marriage to the plaintiff. This property was sold early during the marriage, yielding approximately $13,000. Of this amount, the defendant contributed approximately $7,000 to the plaintiff's business, and the remainder was expended in the course of the defendant's unsuccessful efforts at writing and publishing a book.
The defendant has not contributed to the plaintiff's support of the Claire Hill property since she moved her permanent residence to Maine in 1993. The plaintiff has not contributed to the defendant's support since that time.
 E
The parties' relationship had begun to show marked signs of deterioration by early 1993. The plaintiff began to exhibit signs of stress from his consistent efforts driving back and forth to Hatch Cove to permit the children to visit with their mother. The parties' efforts at counseling had failed to heal their marriage. In February of that year, the defendant, who had been known as Virginia Szydlo during the marriage to date, voluntarily obtained a Probate Court order that she henceforward be known as Virginia Lanning. This change of name had not been discussed with the plaintiff or the children prior to its effect. In addition, the defendant closed a bank account held in the plaintiff's name, keeping the resulting distribution of $1,000 for her own purposes.
The parties had also developed serious conflict concerning best interests of their children. In 1992, the plaintiff had voiced his reluctance to continue the parties' practice of accepting foster children into their home. His business difficulties made it burdensome for him to care for many children while the defendant worked. Notwithstanding their financial woes, the parties traveled together to the Bahamas during the winter of 1993[17]. There, the defendant advised the plaintiff to procure other employment: the plaintiff refused to do so. During the summer of 1993, the defendant resided in Maine with Megan and one of the parties two foster children. The plaintiff remained in Connecticut with Wesley and their second foster CT Page 8629 child. Wesley and the second foster child went to Maine to reside with the defendant in August of 1993: the defendant prohibited the plaintiff from having any contact, including phone contact, with the children during this time.
The parties' conflict over the children continued after the commencement of this action. The defendant had unilaterally enrolled the children in school in Maine, and the plaintiff unilaterally retrieved them and returned them to Connecticut. Subsequently, the defendant brought allegations of sexual abuse against the plaintiff, using only the family court for resolution of these issues. A psychological evaluation concerning this issue resulted in a court order for joint custody of Megan and Wesley, with primary residential placement awarded to the plaintiff, notwithstanding these allegations.
Despite the plaintiff's education and occupational skills, in recent years he has failed to find and pursue employment within his capacity to do so. While the court is cognizant of the plaintiff's entrepreneurial zeal, it notes as well that his persistence in working with CKB has been to the detriment of the family unit. The defendant has successfully pursued her profession as a nurse, and the court credits this action. However, the court notes, as well, that the defendant pursued a number of extra-professional business efforts during this marriage, which also contributed to the union's unpredictable and unstable status. Given the defendant's advanced education and current professional experience, the court finds that she is more likely than the plaintiff to acquire capital assets in the future, and finds that she will continue to earn more income than the plaintiff.
The court further finds that each party has attempted to use marital funds to the for his or her own purposes, not to benefit the other or the family unit, without the full knowledge and understanding of the other, and often to loss of the opposing spouse. Such actions have been acknowledged by this court which is charged with the obligation of assigning ownership of marital assets and liabilities pursuant to § 46b-81.
The plaintiff urges the court to use a mechanistic model, based on the parties' exact financial contributions to their marital assets and debts, to "trace" the share of those extant assets to which each is now entitled, and to assign responsibility for accumulated debt. CT Page 8630
In September 1994, while this matter was pending, the defendant applied at the Probate Court for termination of her parental rights and obligations with regard to both Megan and Wesley. The plaintiff voiced his objection to this petition, whereupon the defendant withdrew that matter from consideration by the Probate Court.
During December of 1995, again while this matter was pending and awaiting imminent trial, the defendant commenced bankruptcy proceedings using the federal courts in Maine. The United States Bankruptcy Court, District of Maine, released the defendant from all dischargeable debts on April 17, 1996.[18] Her financial affidavit, filed April 2, 1996, shows only a $500 debt owed to Family FCU.
 III
The court is of the opinion that the major cause of the failure of this of the marriage was irretrievable breakdown, derived in large part from the parties mutual and equal contribution to their financial irresponsibility, fiscal misadventures, real estate investments, and due to their conflict over their children. The court finds that each party contributed equally to the family's financial misfortunes, miscommunications and disagreements which led to the dissolution of this marriage.
The court has declined the opportunity to utilize this approach in meeting its obligation pursuant to § 46b-81. No evidence was presented at trial from which the court could determine applicable discount and/or inflation rates for use in evaluating the parties' acquisition of marital assets, or participation in indebtedness, during the course of their marriage. Furthermore, the use of such models is discouraged in like cases. "`In family matters, the court exercises its equitable powers. The balancing of equities is a matter which falls within the discretion of the trial court . . . . For that reason, equitable remedies are not bound by formula but are molded to the needs of justice . . . .'" (Internal and external citations omitted.) Oneglia v. Oneglia,14 Conn. App. 267, 271-272 (1988).
The court has evaluated each party's claims to marital property, tangible and intangible, including property which has been held jointly or singly during the course of the marriage, or in which each has a current interest. The court has considered, CT Page 8631 as noted above, the assets which each brought to the marriage, and each party's use of assets during the marriage. The court finds that each has equally dissipated marital assets, and used equal amounts of marital assets for his or her own purposes. To the extent that the plaintiff might otherwise have been entitled to any reimbursement from the defendant arising out of the Maine land transactions identified above, the court must offset this amount in full by the amount of retirement funds to which the defendant would likely be entitled had the defendant not prematurely, and so substantially, invaded the IRA while it was within his full possession and control. The court recognizes that the defendant holds no current legal interest in the Hatch Cove property in Maine so that, whatever its value, that property is not available for distribution to either party at this time. SeeIvey v. Ivey, 83 Conn. 490, 492 (1981).
Having determined that the plaintiff has the capacity to earn income of $25,000 per year, or $480 per week, the court has utilized this amount, less appropriate guidelines deductions, to assess the basic child support amount due for Megan and Wesley. The court has determined that the defendant has earned income of $44,000 per year, or $852 per week, and has utilized this amount, less appropriate guidelines deductions, including the defendant's health insurance premiums, in assessing the basic support obligation. The court also attributes weekly income of $230 to the defendant, in recognition of the regular and consistent gift of occupancy in the Hatch Cove house that has been extended by the owners of that property. The court recognizes Judge Steinberg's orders for equal sharing of visitation expenses as an order which is equitable and appropriate, not requiring a deviation from the guidelines, given the financial circumstances of the parties. Accordingly, the court finds that the guidelines basic support allocation for the parties' two children is $370 per week. Of this amount, the defendant's share shall be a contribution of $240.00 per week.
 IV ORDERS
1. CUSTODY.
The parties will observe the custody, visitation and parenting orders entered by Judge Steinberg on September 22, 1995. CT Page 8632
2. CHILD SUPPORT.
a. The defendant shall pay to the plaintiff support in accordance with the child support guidelines in the amount of $240 per week. Payments shall be deposited by the defendant as first class mail, through the United States Postal Service, on Friday of each week.
b. A wage execution order, applicable to the defendant, shall enter pursuant to General Statutes § 52-362.
c. For income tax purposes, the defendant shall be entitled to the dependency exemption for the Megan for 1996 and succeeding years, and the plaintiff shall be entitled to the dependency exemption for Wesley for 1996 and succeeding years.
d. Upon any change of employment status, including but not limited to identification of employer and rate of compensation for services rendered, the party whose status has changed shall notify the other immediately, by certified mail. Such notification shall contain all information necessary for the other party to prepare a Connecticut Child Support and Arrearage Guidelines worksheet.
e. The parties will exchange personal federal and state income tax returns in each tax year, representing reporting to the pertinent governmental agencies of all income, earned and unearned, declared during that year. These returns will be exchanged by certified mail, and transmitted at the time of filing.
3. HEALTH CARE INSURANCE.
 a. MEGAN
1. The defendant shall maintain Megan as a covered dependent on her employment-related health insurance, and shall pay the premium therefore, so long as such insurance is available while the child resides primarily in the state of Connecticut. The defendant shall make immediate inquiry concerning the availability of this coverage, and shall report promptly report the results of this inquiry, by means of certified mail addressed to the plaintiff. CT Page 8633
2. If such coverage is not available through the defendant's employment, the defendant shall be responsible for procuring equivalent coverage for Megan, and shall pay the annual premium therefore. After payment, the defendant shall submit proof of the same to the plaintiff, by means of certified mail addressed to him. Upon receipt, the plaintiff shall promptly reimburse the plaintiff for one-half the cost of Megan's health insurance.
3. An order pursuant to General Statutes § 46b-84(d) shall enter. The parties shall each pay one-half of the unreimbursed or uncovered health care expenses for this child.
b. WESLEY.
1. The plaintiff shall be responsible for ensuring that Wesley remains eligible for health insurance benefits through the state of Connecticut, which shall serve as his primary insurer. In the event that Wesley ceases to receive this benefit from the state of Connecticut, the plaintiff shall report promptly report the results of this inquiry, by means of certified mail addressed to the plaintiff shall report promptly this change to the defendant, by means of certified mail addressed to the plaintiff.
2. If such coverage is not available through the state of Connecticut, the defendant shall be responsible for procuring health insurance for Wesley, either through her employment or privately, using the protocol prescribed above in Megan's case. The plaintiff shall be responsible for payment of one half of any health insurance premium incurred for Megan as the result of coverage which must be obtained outside of the plaintiff's employment.
3. An order pursuant to General Statutes § 46b-84(d) shall enter. The parties shall each pay one-half of the unreimbursed or uncovered health care expenses for this child.
c. Each party shall be responsible for maintaining such health insurance as he or she deems necessary for his or her own protection.
4. LIFE INSURANCE.
a. The plaintiff shall procure and maintain a policy of insurance on his life, naming each of the minor children as a CT Page 8634 beneficiary in of this policy in equal shares, with a minimum face amount of $50,000.00 for each child, to remain in effect until the named beneficiary reaches the age of eighteen.
b. The defendant shall procure and maintain a policy of insurance on her life, naming each of the minor children as a beneficiary of this policy in equal shares, with a minimum face amount of $100,000.00, to remain in effect until the named beneficiary reaches the age of eighteen.
c. Upon reasonable request, the parties shall provide verification of the existence of these policies to the other.
d. Nothing herein should be construed to limit the face amount of these policies. Should the parties jointly or independently decide to further secure their children's well being by procuring additional insurance, this order does not preclude such generosity.
e. The parties' life insurance policies are necessary for the support and maintenance of the minor children, and shall be exempt from any discharge in bankruptcy, as contemplated by federal law.
5. ALIMONY.
a. The court determines that no alimony shall be awarded to the plaintiff in this case, as the court finds no basis for any award of the same.
b. The court awards $1 per year alimony to the defendant, payable by the plaintiff. This issue is subject to opening and modification only in the event that the either the plaintiff or CKB, or both, have declared bankruptcy, or have accumulated a deficiency or defaulted on the debts the plaintiff must assume pursuant to paragraphs 6.a.2 and 7.b of these orders.
c. To effectuate this order, the plaintiff is obligated to notify the defendant promptly, by certified mail, of any bankruptcy proceedings in which he or CKB is involved. The plaintiff shall also notify the defendant promptly, by certified mail, of any deficiency he or CKB has accumulated on those debts referenced herein, or of any default status he or CKB has developed concerning these debts. CT Page 8635
6. REAL ESTATE
 a. 70 CLAIRE HILL ROAD IN BURLINGTON, CONNECTICUT.
1. The plaintiff shall have this property to be his alone, for his use and without interference from the defendant.
2. The plaintiff shall be obligated to assume full responsibility for any and all debts and liabilities represented by mortgages on the Claire Hill property, including but not limited to the mortgage interest resulting from the aforementioned refinancing of this property in 1989 and the SBA loan for which this property was used as a guarantee. The plaintiff shall save and hold the defendant harmless from claims arising from any obligations she may have undertaken with regard to this indebtedness, which is henceforth the sole responsibility of the plaintiff. The plaintiff shall immediately notify all creditors of this order, in writing, and he shall provide the defendant, by certified mail, with a copy of each notification
b. "TIME SHARE" IN SEDONA, ARIZONA.
1. The defendant shall immediately quitclaim or transfer to the plaintiff any and all interest she holds in this property, and the plaintiff shall thereupon promptly arrange for sale of this property. The plaintiff shall procure the services of a licensed and experienced real estate broker or other agent lawfully entitled to list and sell such property in the state of Arizona. The plaintiff shall initially offer the property for sale at a reasonable market value. Should a contract for sale of the property not have been executed within four months of the date when the property is listed for sale, the plaintiff shall reduce the sale price by 5%. Such price reduction shall continue to each six months until the property has been sold.
2. The plaintiff shall be responsible for presenting the defendant with such legal documents as are necessary for him to secure sole title to this property, such as a quitclaim deed or other instrument lawfully recognized for this purpose under the laws of the state of Arizona. The defendant plaintiff shall promptly execute such documents as are necessary to secure the plaintiff's entitlement.
3. The plaintiff shall cooperate with his agent or broker in Arizona and shall use his best efforts to effectuate a CT Page 8636 timely sale of this property. The plaintiff shall be entitled to such use of the property as is reasonable during the period of sale.
4. Prior to sale of the property, the plaintiff is obligated to pay all costs and expenses, including taxes, as may be associated with maintenance of the "time share." Upon expenditure, he shall promptly notify the defendant of the same by certified mail, and he shall provide her with a copy of each invoice or bill supporting this expenditure as well as a copy of each document representing his transmittal of funds in response to such invoice or bill. Immediately upon receipt of each such notification, the defendant shall reimburse the plaintiff for one half of each expenditure, transmitting such reimbursement by certified mail.
4. Upon sale of the property, the net proceeds, after deduction of transaction costs, are to be divided equally between the parties. The plaintiff shall be responsible for ensuring that the defendant timely receives her share of the proceeds, and shall provide the defendant with an accounting which represents the sale price of this property, transaction costs, and each party's share of the proceeds.
5. Each party shall bear one half the burden of any capital gains tax liability which may flow from the sale of this property, and each shall be entitled to utilize one half of any loss resulting therefrom, to the extent allowable by law.
7. CREATIVE KITCHEN AND BATH
a. The plaintiff shall be entitled to the entire interest in the business identified as Creative Kitchen and Bath, Inc., and he shall have the same to hold and to use for his own purposes, without any interference from the defendant. The plaintiff shall thus be entitled to the entirety of that interest in the assets of CKB which represents his shareholder's interest, without distribution of this asset to the defendant.
b. The plaintiff shall be obligated to assume full responsibility for any and all debts and liabilities of CKB which flow from actions he has taken on behalf of that enterprise or which arise from his participation as a partner or shareholder of CKB, including but not limited to the SBA loan identified herein and any other notes or obligations representing funds borrowed by CT Page 8637 CKB. The plaintiff shall save and hold the defendant harmless from claims arising from any obligations she may have undertaken with regard to this indebtedness, which is henceforth the sole responsibility of the plaintiff. The plaintiff shall immediately notify all creditors of this order, in writing, and he shall provide the defendant, by certified mail, with a copy of each notification
c. Consistent with paragraph 6.a.2. of these orders, the defendant is hereby released from any obligation she may have held concerning the SBA loan undertaken for the benefit of CKB. The plaintiff shall save and hold the defendant harmless from claims arising from any obligations she may have undertaken with regard to this indebtedness, which is henceforth the sole responsibility of the plaintiff. The plaintiff shall immediately notify all creditors of this order, in writing, and he shall provide the defendant, by certified mail, with a copy of each notification.
d. The plaintiff shall be fully entitled to any and all disbursements or interest payments made to him by CKB, including but not limited to salary payments, payments of interest on any personal loans made by the plaintiff to CKB, or profits distributed to him by the corporation. The plaintiff shall immediately notify the defendant, by certified mail of any payments made by CKB to third persons on his behalf or at his request. This notice shall include specific information concerning the payor, the payee, the date of payment and the amount of funds transferred.
8. PENSION.
The plaintiff shall have full title to and interest in the existing funds constituting his Advest IRA, and he shall hold and use these funds as his alone, from this date forward, without any use or entitlement in this property on behalf of the defendant. The plaintiff shall be entitled to identify a person other than the defendant as the beneficiary of this IRA account, in the event of his death prior to the exhaustion of the funds remaining therein. The plaintiff shall be responsible for all tax liabilities arising from his premature use of the IRA funds.
9. MARITAL DEBTS.
As to any debt not addressed above, each party is ordered to CT Page 8638 pay all liabilities identified on his or her financial affidavit, and to save hold the opposing party harmless from any claims thereon.
10. AUTOMOBILES.
The defendant may keep, as hers to use and have separate and apart from the plaintiff, the 1989 Buick Century described on her financial affidavit filed April 2, 1996.
11. PERSONAL PROPERTY.
Each party may keep, as his or hers to use and have separate and apart from the other, the personal property described on his or her financial affidavit, filed on April 2, 1996.
12. BANK ACCOUNTS.
Each party may keep, as his or hers to use and have separate and apart from the other, the bank accounts described on his or her financial affidavit, filed on April 2, 1996.
13. COUNSEL FEES.
 a. FEES FOR COUNSEL FOR THE MINOR CHILDREN.
The parties shall observe all existing orders for payment of any fees incurred for services rendered by counsel for the minor children, which fees have not been paid to date. Such fees, and compensation for such services, are necessary for the support and; maintenance of the minor children, and shall be exempt from any discharge in bankruptcy, as contemplated by11 U.S.C. § 523(a)(5).
b. OTHER COUNSEL FEES
Pursuant to General Statutes § 46b-62, in light of the parties' respective financial abilities and the criteria set forth in § 46b-82, the defendant shall pay to the plaintiff, $2,500 by way of attorney's fees. This order acknowledges fees incurred for trial of the matter, as well as to fees incurred for litigation of custody and child support matters unrelated to trial of this matter.
Judgment shall enter in accordance with this Memorandum of CT Page 8639 Decision.
N. Rubinow, J.