[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This dissolution action came to the court on July 7, 1998 and was tried to the court on May 2, 2000 when the parties appeared with counsel. The parties were married on September 20, 1980 in Ansonia, Connecticut. They have resided in Connecticut since their marriage. They have three children, issue of the marriage, Christopher, born November 6, 1981, David, born December 1, 1982 and Tammy, born February 17, 1987. Neither the parties nor their children have received financial assistance from the state or any town or municipality. The court has jurisdiction to hear this matter.
The court has listened to and observed the witnesses. It was evident from their demeanor that the parties had lost trust in each other. They were in agreement, however, that their children were well-adjusted and doing well and they were justifiably proud of them. The court has also reviewed all the exhibits in the case. It has considered the claims of the parties.
In addition, the court has carefully considered the criteria set forth in Connecticut General Statutes §§ 46b-56, 46b-62, 46b-81, 46b-82,46b-84 in reaching the decisions reflected in the orders that follows.
The court has also weighed the holding of the Appellate Court inO'Neill v. O'Neill, 13 Conn. App. 300, 311, cert. denied, 207 Conn. 806, (1988) wherein the court said as follows:
 A property division ought to accord value to those non-monetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary care taking responsibilities. See also Blake v. Blake, 207 Conn. 217, 230-31 (1988).
The court finds the facts which follow. At the time of the hearing, the plaintiff wife was 44 years old and the defendant husband was 43. Both are in good health although the plaintiff has Fuchs' Dystrophy, a corneal degenerative condition. She may need a corneal transplant in approximately ten years, but is currently asymptomatic.
The plaintiff attended college for one year studying interior design. CT Page 10476 At the time of trial, she worked at Hudson United Bank as an assistant manager with a gross weekly salary of $538.46. Although she has experience as a loan originator and could seek employment as such, she prefers the security of receiving a fixed salary to receiving a base salary and commissions as a loan originator.
In 1980 and 1981, the plaintiff worked as a cashier and manager at Fashion Bug retail store. When children were born, the plaintiff and the defendant agreed that the plaintiff should remain at home to raise the children. The plaintiff's grandmother lived with the family weekdays and helped care for the children. The plaintiff started a craft business and the defendant assisted her in transporting and selling her silk flower arrangements and other items at craft shows. She earned no more than $3000. In addition, she babysat to earn money.
The defendant did not attend college. He expected to become employed within one week of the dissolution hearing by Auto Advantage Credit. He will administer a computer program that deals with the financing of cars. He expects to earn between $59,000 and $69,000 per year.
However, he still receives occasional payments from insurance premiums. His financial affidavit reflects gross weekly income of $1458. This figure yields an annual yearly income of $75,816.
The defendant worked throughout the marriage except for a three-week period. He has done well when not operating his own business. The parties enjoyed a life style that included family vacations and cruises to Cancun and Florida. The defendant bought the plaintiff diamonds, tennis bracelets, cocktail rings and new cars.
The parties separated in June 1998. Their marriage has broken down irretrievably. Throughout their marriage they quarreled over financial matters. The defendant, a skilled salesman, invested more money in his business ventures and spent more money on his personal expenses than their financial situation warranted. When the parties were first married, the defendant worked in a liquor store. After they married, the defendant started his own business, Quality Wines. The plaintiff lent the defendant $10,000, which she had brought into the marriage, for the business. Instead, the defendant used the money to invest in the stock market. When he lost money in the stock market, the business failed. As a further consequence of the failure of Quality Wines, the defendant borrowed $20,000 without interest from his wife. He used part of the funds to settle a lawsuit resulting from the business brought by Richard La Pine against the parties. He has not repaid the plaintiff. At another time, the plaintiff cashed in life insurance so that the defendant could buy a car. CT Page 10477
After the failure of Quality Wines, the defendant became a liquor salesman. He then moved into the insurance field from 1991 to 1993 before finding a position in the mortgage business. Today he continues to receive small sums as commissions for insurance policies he sold during this time. In 1993 he declared personal bankruptcy.
He started a career in mortgage lending with Family Financial and then worked for Fairbanks Mortgage until 1997. At Fairbanks, he earned $140,000 gross income in 1995, $135,000 in 1996 and $116,000 in 1997.
In 1998 the defendant obtained employment at First National Funding. It required that he set up his own office. The defendant assured the plaintiff that this position was a "job" and not a new business. The plaintiff learned that it was not a "job" but that the defendant would have to invest his own money in establishing an office and hiring staff. Consequently, she offered to process loans to save some costs. The plaintiff originated loans following up the leads her husband gave her or those she obtained on the Internet.
At this time, the parties were building a home. The defendant used money in the checking account set aside to complete the foundation to purchase an expensive telephone system and computer equipment for the business. The business encountered. financial difficulties. The relationship of the parties became more frayed as the plaintiff became increasingly concerned about their financial situation. By this point their financial history included a business bankruptcy and the defendant's personal bankruptcy. One evening the plaintiff returned to the office to discuss a family matter with her husband and an argument ensued. The defendant accused the plaintiff of attempting to steal from the office. The defendant called the police department and held the plaintiff in a chair until the officers arrived. She filed this action shortly thereafter.
The defendant filed no tax return for 1998, the year he had business difficulties, nor for 1999 although he obtained an extension for filing those returns. He returned to work for Fairbanks. His bank records show that in October, 1999 there were credits of $4,764.96 to his account; in November $4,854.96; in December $5,747.91. In August 1999, he made deposits to that account which totaled $3,800 and in July he deposited $23,884 from cashing in his 401K. By court order of June 7, 1999 he was to liquidate his 401K "to the extent necessary to pay the children's tuition reservation, tuition arrearage, and penalties for liquidating only." He retained over $12,000 using the extra money to pay the IRS, child support, dance lessons for the daughter and attorney's fees. CT Page 10478
He worked for Fairbanks through March 2000. He received a commission and severance checks through April. Nevertheless, during the pendency of this action, he failed to pay the children's tuition and child support in a timely manner as ordered by the court. On his October 7, 1998 financial affidavit, he reported gross weekly income of $1,903.86 or of $99,000 per year from First National Funding Corporation of America. On June 7, 1999 he reported that his gross weekly income from First National declined to $434.78.
The defendant claimed at trial that he did not minimize his income. He claimed not to know or recall the source of several checks issued to him. The court did not believe his testimony that several deposits to his account resulted from his helping a friend rather than from earnings. According to the defendant, the friend, who operates Grand Avenue check cashing service, entrusted the defendant with checks with instructions to deposit them to the defendant's own account in exchange for cash and return with the cash to Grand Avenue. The defendant's claim was not supported by the evidence.
In January 2000 he purchased a 2000 Chrysler Sebring valued at $26,000. Although he claims that the transaction involving the Sebring was a "wash", he did not select a less expensive car so as to reduce `his then monthly car payments of $400. He is presently obligated to pay $488 per month for the Sebring. He made this purchase despite owing an arrearage on child support and despite failing to pay the children's tuition as he had agreed before this court on October 13, 1998.
In February, 2000, the defendant took a loan in the amount of $8,800 against a life insurance policy. He repaid some personal debts and child support. This reduced the cash value of the $500,000 policy to $12,000. In addition, the defendant's financial affidavit lists credit card and debt to the IRS in excess of $46,000 excluding mortgages, medical bills and the loan to the plaintiff. The defendant lists among his liabilities his obligations on the mortgage but then does not claim a corresponding equity interest in the real property thereby deflating the face value of his assets while increasing his liabilities.
The defendant is also the sole owner of Marketwise of Ct., LLC. It has no assets or value. On his June 7, 1999 financial affidavit he stated that he provided a loan to Marketwise from money he borrowed from HFC in the amount of $10,000. The corporation was paying him $48.42 per week in June 1999 but no payment is recorded on the financial affidavit filed at trial. The court finds that the defendant has been less than truthful with regard to Marketwise. It strains credulity to believe that HFC would provide a loan to an individual making $434.78 per week with the list of liabilities the defendant shows on the June 1999 affidavit and it further CT Page 10479 strains credulity to believe that Marketwise, with no assets or income, was able to pay the defendant any sum per week.
These facts, together with the violation of the automatic orders, completely undermined the defendant's credibility. They support the plaintiff's claim that the breakdown of the marriage was largely caused by the defendant's excessive spending rather than his claim that the breakdown was caused by the plaintiff's wish to control his business arrangements. The court finds, therefore, that the defendant minimized his earning capacity which the court finds to be $99,000 per year. (See Bleuer v. Bleuer, 59 Conn. App. 167, 170 (2000).
The plaintiff holds sole legal title to the marital home in Naugatuck. The fair market value of the home is approximately $104,000. There are two mortgages totaling $76,500 against the property. The plaintiff also holds sole legal title to lot 62, Graham Road, Naugatuck. The value of that lot is $74,000. The mortgage balance is $52,000. It is owed to the plaintiff's mother who made the balloon payment for the parties on the initial mortgage. Payments on that mortgage are made sporadically by the plaintiff. Lot 62 was transferred to the plaintiff after the defendant had used the money set aside for the construction of a home on that lot for his business in 1998. The parties also own a time share valued at $9,000. At the end of trial, the parties agreed that title could be transferred to the plaintiff in consideration of the defendant having the right to claim the children as dependents on his tax returns. The plaintiff also owns 150 shares of McDermit stock valued at $23 per share which total approximately $3,450. She omitted from the financial affidavit dated May 2, 2000 the shares of McDermit she owns jointly with her mother which she listed on her financial affidavit of June 7, 1999 in the amount of $5,250. It is not clear to the court whether she still owns a portion of those shares and, if not, whether she disposed of them during the pendency of this action in violation of the automatic orders. Her other asset is a Chrysler automobile valued at $10,000.
On September 5, 1998, shortly after she filed this dissolution action, she signed an application to open custodial accounts for the three children with money the children received from her grandmother. She listed her net worth as $150,000 and her income as $70,000 as a loan originator. Although she did not swear to the information she provided, she did sign the statement which states in section 8 "I have supplied all of the information contained in this Account Application and I declare it as true and accurate and further agree to notify PaineWebber in writing of any material changes including those to my financial situation or investment objectives." Since she failed to provide PaineWebber with her correct net worth, it could be concluded that she disposed of over $60,000 in assets during the pendency of the action in violation of the CT Page 10480 automatic orders. No evidence was offered, however, to show that such additional assets existed. The court finds that she knew the information was incorrect but signed the applications because no oath was required. In any case, the evidence furnished by the applications undermines her credibility.
The court finds that the marriage has broken down irretrievably and judgment of dissolution shall enter on this ground. The following orders shall enter:
1. Custody and Visitation
The parties shall share joint legal custody of their children. The plaintiff shall have residential custody of the minor children. The defendant shall have flexible, liberal and reasonable visitation.
2. Child Support
The defendant shall pay the sum of $275 per week as child support by immediate wage. garnishment. This amount conforms to the child support guidelines. This sum shall be paid until the parties' son David attains the age of 19 years or graduates from high school, whichever event first occurs. He shall then pay child support for the minor child Tammy pursuant to the child support guidelines in effect at the time he is no longer obligated to pay child support for David. He shall continue to pay child support for Tammy until she attains the age of 19 or graduates from high school, whichever event first occurs. Said child support shall be paid by immediate wage execution.
At the time of trial, the defendant owed $3,792 in child support. That amount is to be reduced by the $3,500, together with any accrued interest, which is held by Attorney Sirois and represents the balance remaining after the IRA monies were withdrawn by the defendant. That sum is to be paid to the plaintiff within 15 days of the date of this decision. In the event the arrearage has increased since the conclusion of the trial, the defendant shall continue to pay $25 per week, by immediate wage execution, until the entire arrearage is paid in full. Any funds which remain in the trustee account after the arrearage is fully paid, shall become the property of the defendant.
3. Medical Insurance:
The defendant shall provide medical insurance for the minor children through his employer. The plaintiff shall also provide coverage if it is available to her through her employer at no additional cost to her. In the event insurance is not available to the defendant through his CT Page 10481 employer, he is to immediately notify the plaintiff and secure other coverage. If, however, the plaintiff can provide such coverage at a lesser cost, the defendant shall reimburse the additional cost to her, if any, of such coverage. The defendant shall pay 60% and the plaintiff 40% of the unreimbursed medical expenses including dental, orthodontic, psychological and psychiatric services and prescriptive medications.
4. Alimony
The defendant shall pay to the plaintiff the sum of $400 per week as periodic alimony for 10 years or until the death of either party or until the plaintiff remarries. Said amount shall be paid by immediate wage execution.
5. Real Property
1. Time Share: The defendant shall transfer to the plaintiff his interest in the Vistana time share. She shall be responsible for the payment of taxes, insurance and maintenance costs and hold the husband harmless and indemnified thereon.
2. 6 Joseph Road, Naugatuck: The plaintiff shall retain legal title to the marital domicile. She shall pay the mortgages, taxes, insurance and other expenses in connection therewith. She shall hold the defendant harmless and indemnified thereon. No later than September 1, 2006 she shall refinance the property or list it for sale and retain the net proceeds. The purpose of this order is to terminate the defendant's liability on the mortgages.
3. Lot 62, Graham Road, Naugatuck: The plaintiff shall retain sole legal title to the property. She shall pay the mortgage, taxes, insurance and other expenses on the property. The plaintiff shall sell Lot 62 within one year of this date. She shall pay the mortgage to her mother and apply the remaining proceeds to the second mortgage or home equity line of credit on 6 Joseph Road if payment will not incur a prepayment penalty. The intent of this order is to terminate or reduce the defendant's liability on that mortgage. In the event that a prepayment penalty will be incurred, she is to deposit the proceeds into an interest bearing account to pay off the home equity mortgage loan at the earliest possible date without penalty but no later than the time at which she refinances or sells 62 Joseph Road.
6. Personal Property
a. Children's bank accounts: The plaintiff shall hold the custodian accounts at PaineWebber for the benefit of the minor children. The funds CT Page 10482 shall be withdrawn for the children's educational and medical expenses only.
b. Businesses: The plaintiff shall receive one-half of the defendant's interest in Marketwise. The defendant shall receive one-half of the plaintiff's interest in her craft business.
c. Miscellaneous property: The parties shall retain those items of personal property listed on their financial affidavits. The funds from the IRA which had to be prematurely withdrawn are credited in their entirety to the asset distribution in favor of the defendant although they are liquidated.
7. Life Insurance
The defendant shall repay the loan to Jefferson Pilot within four years so as to restore the policy to its maximum value. This policy is to be kept in effect until his obligation to pay child support and alimony is terminated. He is not to encumber the policy further by taking any other loans against it.
8. Dependency Exemption
The defendant shall take the children as his dependents on his federal income tax return so long as he has an obligation to support them and his income is in excess of $75,000 per year. In the event his income declines below that amount, the plaintiff shall claim the children as dependents.
9. Liabilities
The plaintiff shall pay the following obligations listed on her financial affidavit:
First Union Car taxes for the Toyota and Chrysler Super Rewards Filene's Wachovia USA First Card US Visa First USA Dr. Levada and eyeglasses Attorneys fees Mother's loan Fleet First Card CT Page 10483 Dr. Tarasuk Art Rich Studio
The defendant is to pay the following bills listed on his financial affidavit:
 Capital One (3 accounts) FNCB HEC Pitney Bowes Waterbury Hospital Filene's Orthodontist IRS
Judgment shall enter accordingly.
Counsel is commended for their presentation of their clients' respective positions.
SANDRA VILARDI LEHENY, J.